[Cite as *State ex rel. Cordray v. Basinger*, 2010-Ohio-4870.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, ex rel., | ) | |
| RICHARD CORDRAY, | ) | CASE NO. 09 MA 119 |
| OHIO ATTORNEY GENERAL, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| J. PAUL BASINGER, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from Common Pleas
                                                    Court, Case No. 07 CV 2481.

JUDGMENT:                                   Affirmed.

APPEARANCES:
For Plaintiff-Appellee:                      Richard Cordray
                                                    Ohio Attorney General
                                                    Attorney Michelle Sutter
                                                    Attorney Sari L. Mandel
                                                    Assistant Attorney Generals
                                                    Enviornmental Enforcement
                                                    30 E. Broad Street, 25th Floor
                                                    Columbus, OH  43215-3400

For Defendant-Appellant:                 Attorney Richard J. Thomas
                                                    Attorney Wade Doerr
                                                    6 Federal Plaza Central
                                                    Suite 1300
                                                    Youngstown, OH  44503-1473

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Cheryl L. Waite

                                                    Dated:  September 30, 2010

DeGenaro, J.

{¶1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs and their oral arguments before this court. J. Paul Basinger appeals the June 12, 2009 judgment of the Mahoning County Court of Common Pleas, adopting the May 5, 2009 magistrate's decision finding that Basinger should pay a civil penalty of $84,405.00 to the Ohio Department of Commerce, Division of the Fire Marshal, Bureau of Underground Storage Tank Regulations (BUSTR), for the improper management of an Underground Storage Tank (UST) on his property, and failure to timely remove the UST upon an order of the fire marshal.

{¶2} Basinger raises multiple arguments, the first being that the trial court's decision was against the manifest weight of the evidence. Second, that the fire marshal was not authorized to order removal of the UST absent proof that petroleum remained in the UST. Third, that he was subject to contradictory regulations and that he received contradictory information from different government agencies, rendering compliance impossible. Fourth, that the civil penalty assessment factors of the Environmental Protection Agency Civil Penalty Policy did not support the $84,405.00 penalty, and that Basinger's costs expended toward eventual compliance should have been subtracted from the total penalty amount. Fifth, that the Attorney General failed to name the proper defendant by filing suit against Basinger personally, rather than against Basinger in his capacity as trustee for the UST property. Finally, Basinger argues that his eventual compliance with the fire marshal's order and BUSTR regulations on November 6, 2007 mooted the action and rendered it non-justiciable.

{¶3} The trial court did not abuse its discretion in upholding the decision to impose the $84,405.00 fine against Basinger. The Attorney General presented proof that Basinger was in violation of BUSTR regulations, that he was notified of his violations in 2001 and asked to remove the UST, that Basinger did not take action to comply, that the State Fire marshal officially ordered Basinger to remove the UST in 2003, and that Basinger did not remove the UST until 2007. The Attorney General provided proof that 1.5 inches of petroleum remained in Basinger's UST, and Basinger's failure to appeal the

2003 order of the fire marshal rendered the issue res judicata. The contradictory laws alleged by Basinger were merely multiple laws requiring multiple kinds of insurance and registration fees for a UST, all of which Basinger was required to follow. Regardless of any miscommunications with different government agencies, Basinger made no effort to comply with any government entity, let alone two allegedly conflicting ones, rendering his impossible-compliance argument a nonissue. The fine of $35.00 per day for Basinger's 2423 days in violation was well within the trial court's discretionary range of up to $10,000.00 per day of violation. The trial court did not abuse its discretion by refusing to subtract the cost of compliance, which Basinger avoided for almost seven years, from the total amount of the fine. Basinger's status as a beneficiary to the alleged trust, with an equitable interest in the UST property, rendered him liable for BUSTR violations, and Basinger was therefore a proper defendant to the Attorney General's action regardless of the existence of a trust. Finally, Basinger's eventual compliance with BUSTR regulations in 2007 did not moot the action to impose a civil penalty for Basinger's noncompliance from 2001 to 2007. Accordingly, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶4} On July 10, 2007, the Attorney General filed a Complaint for Injunctive Relief and Civil Penalties against J. Paul Basinger. The Attorney General alleged that Basinger was the owner and responsible person in relation to an underground storage tank (UST) containing regulated substances, pursuant to definitions within R.C. 3737.87 and OAC Chapter 1301:7-9. The Attorney General alleged that Basinger had left the UST out of service for over one year without properly managing the UST and without having performed a closure assessment and other procedures required by Ohio law, and as specifically required by an Order of the State Fire Marshal. The Attorney General asked that Basinger be ordered to take the necessary steps to bring his UST in compliance with Ohio law, that he be permanently enjoined from violating R.C. Chapter 3737, and that he pay a civil penalty of $10,000.00 for each day of violation including days of continued violation following the Attorney General's complaint.

{¶5} Subsequent to the completion of discovery, substitution of defense counsel,

and continuances, the matter proceeded to trial on February 11, 2009. The following facts were presented through the testimony of Basinger and of Verne Ord, Assistant Fire Chief, as well as documentary evidence submitted by both parties.

**{¶6}** According to Basinger's testimony, he purchased the real estate at a sheriff's auction in 1994, and was made aware that there was a UST in the land. Basinger testified that the UST was empty at the time of purchase, and that the previous owner provided him with reports of inspections performed in 1993, showing no soil contamination. Pursuant to that sale, on November 23, 1994, Poole Truck Line, Inc. recorded a warranty deed, stating that on November 18, 1994 it conveyed the property at 11017 Market Street, North Lima, Ohio to "J. Paul Basinger, Trustee." Over the years, Basinger leased the real estate to various companies, such as ABF Freight and Service Transport Group, who did not use the UST. Pursuant to OAC 1301:7-9-04, Basinger completed yearly UST registration renewals, and paid the yearly fee of $50.00. In his 2001 renewal application, Basinger listed the UST as "currently in use" and as containing "diesel."

**{¶7}** On March 19, 2001, an inspector from the Ohio Bureau of Underground Storage Tank Regulations (BUSTR) conducted an inspection of Basinger's UST. The Compliance Inspection Report indicates that the UST had been "out of service since at least 1997," did not have a proper "overfill protection" system, and did not have a "release detection method" in place. The report further found that Basinger provided documentation of current registration of the UST, but no documentation of financial responsibility or insurance coverage certificates from the Petroleum Underground Storage Tank Release Compensation Board (PUSTRCB). Basinger was cited for seven violations of various sections of OAC Chapter 1301:7-9 and fined $375.00.

**{¶8}** On March 28, 2001, Basinger sent a letter to BUSTR explaining that he had been notified of his violations. Basinger described his personal difficulty in learning how to rectify the violations, and requested instructions in writing regarding the steps that he would need to take. BUSTR's reply on September 19, 2001 stated that due to the particular circumstances of Basinger's UST, the most appropriate and feasible correction

would be to permanently remove the UST. BUSTR requested that Basinger sign and comply with BUSTR's proposed Expedited Enforcement Compliance Order and Settlement Agreement, in which Basinger was to agree to remove the UST, and BUSTR would agree to take no further action against Basinger for his violations. BUSTR assigned a deadline of October 19, 2001 for permit applications and the payment of fees, and a deadline of December 19, 2001 for the removal of the UST.

{¶9} On October 18, 2001, Basinger sent further correspondence requesting a time extension and explanations of options other than permanent removal of the UST, such as putting the UST back in service, permanent closure "in-place," or performing a change in service so that the UST could contain non-regulated substances. Basinger further noted that the property was leased to another party, who had contractually taken responsibility for environmental concerns. On December 19, 2001, BUSTR replied to Basinger's request, extending Basinger's compliance deadline by three months, explaining the basic steps for each option, and strongly suggesting that Basinger consult with an environmental attorney or other such expert. In a January 18, 2002 letter, Basinger complained that BUSTR did not explain what effect Basinger's lessor status had on his liability for the UST. Basinger explained that he would not sign the Settlement Agreement for fear of assuming a liability that potentially fell on the lessee. Basinger stated that he was taking steps to effect a change in service of the UST, and requested further extensions on his compliance deadlines.

{¶10} Meanwhile, the Petroleum Underground Storage Tank Release Compensation Board (PUSTRCB) sent correspondence to Basinger on January 16, 2002, explaining that they had been made aware that Basinger was the present owner of the UST. The letter explained that all UST owners are required by Ohio law to pay a yearly fee to the Ohio Financial Assurance Fund in order to maintain a Certificate of Coverage, and that PUSTRCB had not received such fees from 1992 through 2001 for Basinger's UST. On January 21, 2002, Basinger responded, stating that he had never before been asked to participate in the Fund, that he is only the lessor of the property, that the UST is empty and has remained unused since he purchased the property in 1994, that he has

maintained current registration status with BUSTR, and that he plans to effect a change in service of the UST. PUSTRCB replied on February 15, 2002, explaining that Basinger is nonetheless required to pay the yearly fee to the Fund so long as the UST remains in the property. PUSTRCB stated that Basinger would not be obligated to back-pay the fees from 1994 through 1998, but would be obligated to pay all yearly fees due from 1999 through the present. Basinger testified that he never took the steps to obtain a Certificate of Coverage from PUSTRCB as required.

{¶11} On May 23, 2002, BUSTR performed a second inspection of Basinger's UST property. The Compliance Inspection Report noted that there had been no changes to the UST, and that the same violations continued to exist. On June 14, 2002, BUSTR wrote to Basinger, noting that they had not received any information from Basinger in the last six months, and requesting a response in lieu of taking further enforcement actions. Basinger did not respond to the Report or letter.

{¶12} On September 25, 2003, BUSTR notified Basinger that due to his continued violations and failure to respond to BUSTR's requests for compliance, the State Fire Marshal had issued an official order requiring Basinger's compliance. The State Fire Marshal's Final Findings and Orders found that Basinger was the owner of the UST, that the UST contained diesel fuel, and that Basinger continued to be noncompliant with Ohio laws and regulations regarding the UST. The Fire Marshal ordered Basinger to permanently remove the UST from the property within ninety days, perform a closure report and take further action in the case of contamination, and pay a fine of $39,000.00. The Order stated that Basinger had a right to appeal the Order to the Environmental Review Appeals Commission. Basinger did not appeal the Order, nor did he pay the fine or take steps at that time to comply with the Order.

{¶13} On April 13, 2005, Basinger sent an application to the Bureau of Testing and Registration (BTR) for a Change in Service from a regulated substance to a non-regulated substance. Basinger testified that a Fire Chief orally informed him at some point that he would not agree to a change in service for Basinger's UST. The copy of the Permit for Underground Storage Tanks presented by Basinger states that the permit is

conditioned upon a state inspector's presence on the site, and also states that the permit expires six months from the date of issue. Over a year later, on June 30, 2006, BUSTR performed a third inspection of Basinger's UST property. The 2006 Compliance Inspection Report stated that there remained approximately 1.5 inches of petroleum in the UST. The Report noted that a permit had been issued on April 15, 2005 to Basinger to perform a change in service. However, there had been no changes to the UST, and it remained in the same state as reported in the original 2001 Compliance Inspection Report. Basinger testified that he only found out that his change in service request had been denied when orally informed of such on November 22, 2006 by a "Ms. Carter," who may have been an employee of either BUSTR or BTR.

{¶14} As noted above, the Attorney General initiated this action at the request of the State Fire Marshal on July 10, 2007. On or about November 10, 2007, Basinger removed the UST and performed all required assessments, producing findings of no environmental damage to the surrounding area. On January 15, 2008, BUSTR sent a letter informing Basinger of "No Further Action Status Regarding Closure Requirements."

{¶15} On January 29, 2009, Basinger filed a motion for leave to file a motion for summary judgment, arguing among other things that the "No Further Action" letter rendered the action moot. The trial court denied Basinger's motion for leave, noting that the motion was filed one week before trial in a case that had been ongoing since 2007. Subsequent to the February 11, 2009 trial, the Magistrate issued a decision on May 5, 2009, concluding that Basinger had been in violation of BUSTR regulations for 2423 days, that he should pay a civil penalty of $35.00 per day of violation, for a total fine of $84,805.00. The Magistrate also issued an injunction barring Basinger from further violating R.C. Chapter 3737 and related portions of the Ohio Administrative Code.

{¶16} On May 19, 2009, Basinger filed a transcript of the proceedings and objections to the magistrate's decision, raising all of the arguments now asserted on appeal. On June 12, 2009, the trial court adopted the decision of the magistrate, and held that judgment be granted in favor of the Attorney General in the amount of $84,805.00. The trial court's judgment entry did not issue an injunction against Basinger.

{¶17} Basinger has presented six assignments of error for this Court's review. We will address Basinger's arguments out of order to facilitate our analysis of the issues presented.

**Presence of Petroleum**

{¶18} In his second assignment of error, Basinger asserts:

{¶19} "The Court of Common Pleas Erred in its Determination of Whether the State may Require Removal of an Empty Storage Tank Without Evidence that any Petroleum or any Hazardous Substance is Contained Therein."

{¶20} Basinger argues that the fire marshal was not permitted to order Basinger to remove his UST without proof that the UST still contained any petroleum or other hazardous substance. Basinger asserts that the UST had been closed prior to 1994, and that no petroleum remained inside.

{¶21} The Underground Storage Tank Program and Corrective Action Program, which governs and regulates UST's, is codified in R.C. Chapter 3737. Pursuant to R.C. 3737.88, the State Fire Marshal has the authority to adopt and implement rules towards this purpose. The Ohio Fire Marshal's implementation of this program is contained in OAC Chapter 1301:7-9. Pursuant to the 1999 Rules in effect at the time of the citation against Basinger, among the many requirements of an owner or operator of a UST was the requirement that he obtain an out-of-service permit and empty the contents of the UST if the UST system is out of service for more than ninety days. OAC 1301:7-9-12(D)(2) and (G)(1) (1999). Additionally, if the UST system has been out of service for more than twelve months, the following must be done:

{¶22} "If an operating UST system is out of service for more than twelve months, the owners and operators shall permanently remove or permanently abandon the UST system in accordance with the requirements set forth in this rule, unless a demonstration has been made to the satisfaction of the certified fire safety inspector with delegated authority pursuant to rule 1301:7-9-15 of the Administrative Code or the fire marshal, as appropriate, that unusual circumstances require continued maintenance of UST system in its current condition and all procedures specified in paragraph (G)(1) of this rule

[regarding emptying of the tank, opening of vents and securing of lines and pumps] have been followed.  Prior to requesting an extension, owners and operators must perform a closure assessment that meets the requirements of paragraph (K) of this rule."  OAC 1301:7-9-12(G)(2) (1999).

{¶23}  The State Fire Marshal has the authority to issue citations and penalties for violations of BUSTR regulations, and also has the authority to issue orders that UST owners or operators must follow in order to resolve any violations.  R.C. 3737.88; R.C. 3737.882.  Here, the Fire Marshal first attempted to gain compliance on September 19, 2001 by proposing the removal of the UST in a Compliance Order and Settlement Agreement, which Basinger did not sign or follow.  After Basinger took no action on Basinger's own proposed solutions to the violation, the Fire Marshal issued Final Findings and Orders on September 25, 2003, ordering the permanent removal of Basinger's UST.

{¶24}  To support his argument that the Fire Marshal was not permitted to make such an order, Basinger points to the decision of the Eleventh District in *Village of Chardon v. Lawson Ford & Mercury Inc.*, (June 30, 1994), 11th Dist. Nos. 93-G-1788, 93-G-1792.  In *Lawson*, the Village of Chardon commenced an action to compel Lawson to remove abandoned UST's from Village property and perform cleanup, due to a violation of the Building Officials and Code Administrators (BOCA) Fire Prevention Code, effective July 1, 1979 in then OAC Chapter 1301:7-7.  The applicable code section at the time of Lawson's alleged violation, OAC 1301:7-7-28(E)(9), described requirements involving removal and other types of procedures for "any underground storage tank containing flammable or combustible liquids * * *."  Because the code limited its reference only to UST's that *contained* flammable or combustible liquids, the Eleventh District concluded that Chardon would have to provide some evidence that Lawson's tanks contained such liquids in order to require removal.  Because Chardon provided no evidence of the contents of Lawson's tanks at trial, the Eleventh District concluded that Chardon was not authorized to require removal of the tanks under OAC 1301:7-7-28(E)(9).  Basinger argues that *Lawson* indicates that the Fire Marshal had no right to demand removal of the UST, due to Basinger's claim at trial that there had been no petroleum in his UST since

1993.

**{¶25}** This case is distinguishable from *Lawson* for a number of reasons. First, unlike *Lawson*, the Attorney General provided evidence at trial that approximately 1.5 inches of petroleum remained in Basinger's UST. Additionally, the State Fire Marshal's Final Findings and Orders of September 25, 2003 specifically referred to Basinger's UST in its findings of fact as a "UST containing diesel fuel." This alone completely undermines Basinger's argument.

**{¶26}** Additionally, the September 25, 2003 administrative order, which included the finding that the UST contained petroleum and the order that the UST be removed, was a final order, appealable to the Environmental Review Appeals Commission. R.C. 3745.04. The failure to appeal an administrative order waives any subsequent attacks against that same order. See, e.g., *Dayton v. Becker*, 2d Dist. No. 22107, 2008-Ohio-2074, at ¶15. Basinger was given notice that he had the opportunity to challenge the propriety of the fire marshal's decision through an appeal, and he did not do so. Basinger's argument against the findings or conclusions of the fire marshal's 2003 order, including the finding that Basinger's UST contained fuel, is therefore barred by the doctrine of res judicata.

**{¶27}** Thus, regardless of whether *Lawson* is applicable in theory to this case, the proof of petroleum presence renders *Lawson* factually distinguishable, and Basinger's failure to appeal the 2003 Order forfeits this argument. Basinger's second assignment of error is meritless.

### Impossibility of Compliance

**{¶28}** In his third assignment of error, Basinger asserts:

**{¶29}** "The Court of Common Pleas Erred in its Determination that Defendant is Liable for Penalties Assessed Solely by Reason of the State's Contradictory Laws Making Compliance Impossible."

**{¶30}** Basinger presents two arguments in this assignment of error. First he asserts that the Petroleum Underground Storage Tank Compensation Release Board (PUSTRCB) was obligated by Ohio law to issue a certificate of insurance coverage to

Basinger starting in 1994. Basinger also asserts that he received conflicting information from two government bureaus regarding a change in service permit, and argues that the fire marshal was obligated by Ohio law to approve Basinger's 2005 application for a change in service of the UST.

{¶31} For his first argument, Basinger asserts that he complied with all laws regarding insurance, triggering PUSTRCB's obligation to issue a certificate of coverage. As support, Basinger cites *Franklin Iron & Metal Corp. v. Ohio Petroleum Underground Storage Tank Release Compensation Board* (1996), 117 Ohio App.3d 509, 690 N.E.2d 1310. In *Franklin Iron & Metal Corp.*, the Second District found that the board was obligated to issue a certificate of coverage, and not allowed to impose additional requirements, where the appellant had complied with statutory requirements *by paying the Financial Assurance Fund fee* and demonstrating "financial responsibility in compliance with rules adopted by the fire marshal under division (B) of section 3737.882 for the deductible amount." Id. at 516, quoting R.C. 3737.91(D)(1). This case is distinguishable from *Franklin Iron & Metal Corp.* for multiple reasons.

{¶32} First, there is no indication in the record that Basinger complied with R.C. 3737.91(D)(1) by paying the required Financial Assurance Fund fee to PUSTRCB. The correspondence between Basinger and PUSTRCB in 2002 indicates that Basinger failed to pay the required fees from 1999 through 2001. In the correspondence, Basinger seems to argue to PUSTRCB that he is not required to pay the Financial Assurance Fund fee due to his ignorance of the requirement, his status as lessor, and because he has continually paid BUSTR to register the UST. However, the registration of a UST with BUSTR pursuant to OAC 1301:7-9-04 is not related to the requirements for a certificate of insurance coverage with PUSTRCB under 3737.91(D)(1). Basinger's reasons for non-payment offered to PUSTRCB were not valid, he was obligated to pay the Financial Assurance Fund fee, and PUSTRCB did not issue a certificate of coverage as a result of his refusal to do so. Thus, there is no conflicting law that prevented Basinger from receiving a certificate of coverage. Instead, coverage was rightfully denied for Basinger's failure to comply with statutory requirements.

{¶33} Additionally, the case at hand is distinguishable from *Franklin Iron & Metal Corp.* because this case is largely based on a civil penalty for Basinger's failure to obtain a permit prior to the closure of the UST and failure to remove the UST as ordered, not on Basinger's lack of insurance coverage certificate, money owed in regards to insurance, or his right to coverage. Moreover, whether Basinger did or did not have a certificate of coverage from PUSTRCB at the time of BUSTR's first notification of violation in 2001 had no effect on the outcome of Basinger's case, as the magistrate specifically noted that the PUSTRCB's refusal to issue a certificate of coverage was immaterial to the court's decision. Thus, even if Basinger had obtained a certificate of coverage for all of the years at issue, the trial court's decision would have been no different. This first portion of Basinger's assignment of error is therefore meritless.

{¶34} For his second argument, Basinger asserts that he complied with all laws regarding a change in service permit, triggering the fire marshal's obligation to approve the permit. Basinger argues that he received contradictory information when he first received approval of his 2005 application, and then a denial without notice from the fire marshal.

{¶35} The Bureau of Testing and Registration (BTR) is a separate bureau from BUSTR under the Division of the Fire Marshal. BTR is responsible for processing an applicant's change in service permit application. Both parties seem to agree that Basinger's application for change in service permit, submitted April 13, 2005, was granted by BTR, and that the fire marshal's office later denied the permit.

{¶36} In support of his argument that the fire marshal was obligated to approve the change-in-service permit, Basinger again relies on *Franklin Iron & Metal Corp.* However, the focus of *Franklin Iron & Metal Corp.* was on whether the PUSTRCB was obligated to issue a certificate of coverage when an applicant complied with R.C. 3737.91(D)(1), not on whether BUSTR is obligated to grant a change in service for a UST pursuant to OAC 1301:7-9-10 when a complete application is filed. Unlike the mandatory language used in the code sections discussed in *Franklin Iron & Metal Corp.*, the fire marshal has the discretion to deny a permit if the fire marshal finds that the applicant is in

violation of any BUSTR regulations.  OAC 1301:7-9-10(C)(4)(c).  Because Basinger was both in violation of BUSTR regulations and the fire marshal's 2003 Order, the fire marshal's decision to deny Basinger's change in service application was a lawful use of the fire marshal's discretion.

{¶37} As an additional issue, Basinger alleges that the revocation of his 2005 application occurred without notice, leaving him ignorant of the fact that he was out of compliance.  He testified that he did not discover the revocation until he spoke with a woman named Ms. Carter on November 22, 2006, who the Attorney General indicated was probably an employee of BTR.  However, Basinger also seems to have conceded at trial that the local fire chief told Basinger at some point that he would not agree to a change in service.  The evidence presented at trial, indicating that Basinger had knowledge that the 2005 application would be denied, belies his claim of ignorance.

{¶38} Moreover, Basinger would still have been in direct violation of the 2003 Order even if he had been permitted to complete a change in service of the UST.  OAC 1301:7-9-10(C)(4)(b) explicitly states that a change in service permit "shall not be construed as authority to violate any provision of this chapter."  The fire marshal's 2003 Order did not allow Basinger the option to perform a change in service of the UST, and instead provided him with the sole option of removing the UST.  The 2003 Order put Basinger on notice that a change in service of the UST was no longer an option.  Although Basinger got past the first step in the change in service application process in order to circumvent the 2003 Order, and was eventually prevented from circumventing the 2003 Order due to the fire marshal's denial, this sequence of events does not constitute contradictory laws that rendered Basinger's compliance impossible.

{¶39} Most importantly, although the change in service permit was issued by BTR on April 15, 2005, Basinger had done nothing to proceed with a change in service when BUSTR performed a third inspection of the UST on June 30, 2006.  The April 15, 2005 Permit for Underground Storage Tanks offered into evidence by Basinger states that the permit is conditioned upon an inspector's presence on the site, and also states that the permit expires six months from the date of issue, which would have been October of

2005. Basinger provided no evidence that he had taken any of the initial steps to affect a change in service, which would have included contacting a certified UST inspector or fire marshal employee, performing a closure assessment of the UST, and submitting a written closure report to the fire marshal. OAC 1301:7-9-10(C); OAC 1301:7-9-12(I)(J).

**{¶40}** Because Basinger had taken no action to affect a change in service during the six month permit period, or any period prior to 2007, any confusion created by the BTR's issuance of the expired permit becomes irrelevant. Thus, Basinger's second argument is also meritless.

**{¶41}** In conclusion, Basinger's insurance coverage status and change-in-service application status did not have an effect on whether he had been in violation of BUSTR regulations or the fire marshal's Order to remove the UST. PUSTRCB was authorized by law to deny coverage, and the fire marshal had the discretion to deny Basinger's request for a change in service. The facts indicate that Basinger's inaction, rather than any conflict between laws, is what kept Basinger from complying with the applicable Ohio laws and regulations. Accordingly, Basinger's third assignment of error is meritless.

### Calculation of Penalty Amount

**{¶42}** In his fourth assignment of error, Basinger asserts:

**{¶43}** "The Court of Common Pleas Erred in its Application of the Test for Damages and by Failing to Consider Constitutional Precedent."

**{¶44}** Basinger asserts that the trial court abused its discretion in arriving at the amount $84,805.00 for the civil penalty imposed. Basinger also presents a partial argument that his obligations and expenses he incurred for the removal of the UST amounted to an unconstitutional taking.

**{¶45}** Owners and operators of UST's are prohibited from violating statutory laws governing UST's, rules promulgated by the fire marshal in OAC Chapter 1301:7-9, as well as orders issued by the fire marshal. R.C. 3737.882(C)(1). Anyone who violates these laws, regulations, or orders "shall pay a civil penalty of not more than ten thousand dollars for each day that the violation continues. The fire marshal may, by order, assess a civil penalty under this division, or the fire marshal may request the attorney general to bring a

civil action for imposition of the civil penalty in the court of common pleas of the county in which the violation occurred." R.C. 3737.882(C)(2).

{¶46} The statute does not provide guidance as to how the fire marshal or a trial court should set the civil penalty, apart from the maximum of ten thousand dollars per day. In the case at hand, the trial court decided to determine the appropriate penalty amount by referencing the Environmental Protection Agency Civil Penalty Policy ("Penalty Policy"), which was also used by the trial court in the case of *State of Ohio ex rel. Brown v. Dayton Malleable* (1982), 1 Ohio St.3d 151, 1 OBR 185, 438 N.E.2d 120. Here, as in *Dayton Malleable*, the EPA's Penalty Policy is acceptable to use as a reference for choosing a penalty amount, but is not binding upon the court. See *State of Ohio ex rel. Brown v. Dayton Malleable* (Apr. 12, 1981), 2d Dist. No. 6722. Cf. *State ex rel. Dann v. Coen*, 5th Dist. No. 2008 CA 00050, 2009-Ohio-4000, at ¶9, 34-35 (appropriateness of BUSTR violation penalty amount was determined by looking not at the Penalty Policy, but only at whether the penalty amount would deter future conduct, and whether payment of the penalty would result in bankruptcy). Basinger seems to concede that it was appropriate for the trial court to have used the Penalty Policy as guidance for calculating the penalty. However, Basinger asserts that the trial court misapplied the Penalty Policy and thus abused its discretion in determining the civil penalty amount.

{¶47} The Second District described the factors of the Penalty Policy as follows:

{¶48} "Step 1 - Factors comprising Penalty

{¶49} "Determine and add together the appropriate sums for each of the four factors or elements of this policy namely:

{¶50} "the sum appropriate to redress the harm or risk of harm to public health or the environment,

{¶51} "the sum appropriate to remove the economic benefit gained or to be gained from delayed compliance,

{¶52} "the sum appropriate as a penalty for violator's degree of recalcitrance, defiance, or indifference to requirements of the law, and

{¶53} "the sum appropriate to recover unusual or extraordinary enforcement costs

thrust upon the public.

**{¶54}** "Step 2 - Reduction for Mitigating Factors

**{¶55}** "Determine and add together sums appropriate for mitigating factors, of which the most typical are the following:

**{¶56}** "the sum, if any, to reflect any part of the non-compliance attributable to the government itself,

**{¶57}** "the sum appropriate to reflect any part of the non-compliance caused by factors completely beyond violator's control (floods, fires, etc.)

**{¶58}** "Step 3 - Summing of Penalty Factors and Mitigating Reductions

**{¶59}** "Subtract the total reductions of Step 2 from the total penalty of Step 1. The result is the minimum civil penalty * * *." *Dayton Malleable*, 2d Dist. No. 6722.

**{¶60}** Although the Ohio Supreme Court reversed the decision of the Second District, it agreed that the Penalty Policy was allowable as a standard to determine the penalty amount. *Dayton Malleable*, 1 Ohio St.3d at 157. The crux of the Ohio Supreme Court's reversal was that the final penalty amount determined is within the broad discretion of the trial court, and does not require clear and convincing factual evidence for each Penalty Policy factor for each day of violation in order to support a particular penalty amount. Id. at 157-158 (overruling the Second District's decision to reduce the penalty amount for lack of evidence of excessive industrial waste discharge on each claimed day of violation). Thus, although a trial court may look to the Penalty Policy as a way to ensure that it fashions a reasonable civil penalty, the trial court's reference to the Policy does not detract from its broad discretion to impose anywhere up to ten thousand dollars per day for a defendant's violation of BUSTR regulations.

**{¶61}** Here, as to the first factor of the Penalty Policy, the trial court determined that there had been no actual harm, but that Basinger's violation indicated a risk of harm to public health given that the noncompliant UST was in proximity to drinking water wells. For the second factor, the trial court noted that Basinger's eventual cost of removal of the UST and alleged loss of value to the real estate were costs that Basinger avoided for over six years. The trial court reasoned that Basinger gained an economic benefit by delaying

such expenditure. For the third factor, the trial court found that Basinger was made aware of his violations as early as March 19, 2001, and intentionally and significantly delayed taking action. For the fourth factor, the trial court found that compliance was only obtained after using the work efforts of at least ten government employees, over the span of six and a half years. Included in these findings is the implication that the delay in Basinger's compliance was wholly attributable to Basinger, and not to any State actors or other circumstances beyond Basinger's control. The trial court's consideration of these factors, regardless of the strength or weakness of each independent factor, indicates that the trial court's assessment of the penalty amount was not unreasonable, unconscionable or arbitrary.

{¶62} Basinger argues that the trial court misapplied the first factor, risk of harm, because no actual damage resulted from his noncompliance. Basinger also implies that there was no risk of harm because the Attorney General did not prove that the UST still contained petroleum. As discussed in the second assignment of error, the Attorney General did in fact present evidence that some petroleum still remained in Basinger's UST. Moreover, the plain meaning of the Penalty Policy language indicates that risk of harm, rather than actual harm, is all that is required to satisfy the terms of the first factor. Having sources of drinking water near an out-of-compliance, inadequately monitored UST would constitute at least some form of risk. It is true that Basinger did not place the drinking water sources more at risk by having an actual leak of petroleum. However, evidence of such a fact is not required in order for some form of risk to be present. Thus, although the risk Basinger's UST posed was lower than it could have been, it imposed at least some risk to public health and the environment.

{¶63} Basinger argues that the trial court misapplied the second factor, economic benefit, because the UST was not in use during the entirety of Basinger's noncompliance. Basinger seems to argue that this factor would only apply if he received an active monetary benefit, and it is true that Basinger did not receive profits from the delay. However, Basinger did receive a passive monetary benefit by delaying the cost of compliance by six and a half years. As the Attorney General points out, Basinger gained

the time value of money by the delay, just as the defendant had in *Dayton Malleable*. Again, although Basinger's economic benefit was not as large as it could have been in other hypothetical situations, Basinger gained at least some economic benefit by significantly delaying the cost of compliance.

**{¶64}** Basinger argues that the trial court misapplied the third factor, recalcitrance, because the fact that he was unaware of his noncompliance until 2006 negated the possibility of his recalcitrance. Basinger further argues that the penalty should, at most, be calculated for 363 days of noncompliance due to the fact that he was unaware of the change-in-service application revocation until November 22, 2006. However, as discussed, Basinger was repeatedly made aware of his noncompliance throughout the 2001 to 2007 time period, and chose to take no action. Moreover, even though the BTR issued the six-month change in service permit to Basinger in April of 2005, the issuance of the permit did not bring Basinger into even a temporary period of compliance, because he continued to take no action toward compliance. Although Basinger seems to have considered complying with BUSTR regulations at some points between 2001 and 2007, Basinger's failure to actually comply in any fashion at any point clearly demonstrates recalcitrance.

**{¶65}** Basinger argues that the trial court misapplied the fourth factor, enforcement costs, because the trial court did not have evidence before it regarding actual administrative costs incurred in attempting to attain Basinger's compliance. As noted above, the Attorney General did not have to offer such specific facts in order to prove that BUSTR generally incurred more than the usual cost in attempting to resolve Basinger's violations. See *Dayton Malleable*, 1 Ohio St.3d at 157-158. Further, neither the applicable statute nor the Penalty Policy requires a direct correlation between the expenses incurred by the State and the penalty amount of the violator. As the Attorney General points out, the calculation of a civil penalty is a different process than the calculation of damages in contracts or torts cases, and does not require the same kind of proof. The Attorney General was not required to prove, for example, the salaries of each state employee involved with the UST and the number of hours expended by each

employee on Basinger's case. Instead, it is reasonable to infer that the State of Ohio incurred notable costs in enforcing BUSTR regulations against Basinger, which adequately supports the fourth factor of the Penalty Policy.

{¶66} In addition to the four factors of the Penalty Policy, Basinger asserts that the cost of compliance with BUSTR regulations constituted an infringement on Basinger's property rights, and further argues that he should have been compensated for the cost of compliance by subtracting the cost of compliance from the total penalty amount. These assertions seem to be an allusion to an argument that BUSTR regulations resulted in a taking of Basinger's property, in violation of the Takings Clause of the Fifth Amendment.

{¶67} In support of this first assertion, Basinger cites *Ruckleshaus v. Monsanto Co.* (1981), 463 U.S. 1315, 104 S.Ct. 3, 77 L.Ed.2d 1417. The *Ruckelshaus* decision cited by Basinger focuses on a motion for stay by the EPA pending its appeal of an injunction, and whether Monsanto would potentially suffer irreparable injury through the public disclosure of its pesticide trade secrets if the EPA's motion were granted. The Supreme Court determined that irreparable harm was possible, and denied the EPA's motion. However, the Supreme Court's decision on the merits of that same case relied on longstanding precedent and held that the EPA's regulations of Monsanto's trade secrets did not constitute a taking as long as they were rationally related to a legitimate government interest, and did not interfere with reasonable investment-backed expectations. *Ruckelshaus v. Monsanto Co.* (1984), 467 U.S. 986, 1004-1008, 104 S.Ct. 2862, 81 L.Ed.2d 815.

{¶68} Basinger has not presented any argument that BUSTR regulations are not rationally related to a legitimate government interest, or that they somehow interfered with his investment-backed expectations by not providing him with notice of the ramifications of regulation. Regardless of Basinger's incomplete argument, it is quite clear that the government has a legitimate interest in the regulation of the underground storage of petroleum and other hazardous substances, and that the regulations and accompanying penalties regarding the monitoring and maintenance of UST's are rationally related to that interest. The applicable statutory language in R.C. 3737.882 and OAC Chapter 1301:7-9

put Basinger on notice that he could be ordered to remove the UST and would be liable for potentially high penalties if found to be in violation of those regulations. Thus, Basinger has not demonstrated that the enforcement of BUSTR regulations constituted a taking of his property, or that Basinger is owed any compensation for the cost of resolving his violations of the BUSTR regulations.

{¶69} The trial court had the broad discretion to impose a civil penalty of up to ten thousand dollars for each of the 2423 days that Basinger was in violation of BUSTR regulations. The trial court engaged in a thorough and reasoned analysis, and did not abuse its discretion in reaching the amount of $84,405.00. Accordingly, Basinger's fourth assignment of error is meritless.

### Identification of Proper Party-Defendant

{¶70} In his fifth assignment of error, Basinger asserts:

{¶71} "The Court of Common Pleas Erred in its Determination That No Valid Trust was Formed."

{¶72} Basinger asserts that the trial court erred when it found that Basinger had not proven that the UST property was held in trust. Although Basinger's argument focuses almost entirely on the law of trusts, the issue of trust formation does not affect the outcome of the trial court's decision, given the broad applicability of BUSTR regulations.

{¶73} Basinger argues that he and his wife formed a valid trust, with he and his wife as beneficiaries and Basinger as the trustee, that the UST property was trust property, and that the Attorney General therefore could only have filed the action against Basinger in his capacity as trustee, rather than filing it against Basinger as an individual. Basinger contends that it is only possible for him to be a true party in interest to the Attorney General's action in his capacity as a trustee.

{¶74} Who may be a proper defendant in an action can largely depend on the substantive law applicable to the suit. See, e.g., *Murray v. Knight-Ridder, Inc.*, 7th Dist. No. 02 BE 45, 2004-Ohio-821, at ¶99-106 (whether individuals could properly be named as defendants turned on the common law scope of liability for defamation). Here, the

regulation of UST's is governed by R.C. 3737.87 et seq., and OAC Chapter 1301:7-9. For purposes of these sections, the term "owner" means "any person who holds * * * a legal, equitable, or possessory interest of any kind in an underground storage tank system or in the property on which the underground storage tank system is located, including, without limitation, a trust, vendor, vendee, lessor, or lessee." R.C. 3737.87(H). See, also, OAC 1301:7-9-2(B)(41); OAC 1301:7-9-12(B)(1). Under these terms, Basinger meets the definition of "owner" either by having legal title or by having equitable title to the UST property.

{¶75} Basinger states that he is a beneficiary to the trust, which means that he has an equitable interest in the trust property. See *Pack v. Osborn*, 117 Ohio St.3d 14, 2008-Ohio-90, 881 N.E.2d 237, at ¶7, citing Restatement of the Law 2d, Trusts (1959), Section 2, comment f. Assuming arguendo that a valid trust exists, Basinger has equitable title to the UST property as a trust beneficiary, and thus qualifies as an owner of the UST for the purposes of R.C. 3737.87 et seq., and OAC Chapter 1301:7-9. Even as a beneficiary, Basinger may be subject to civil penalties for failure to comply with BUSTR regulations set forth by the fire marshal. A determination of whether a valid trust does or does not exist therefore does not affect the outcome of this assignment of error.

{¶76} Basinger, in his personal capacity, was a proper party defendant to this action, and the trial court did not err by failing to dismiss the action. Accordingly, Basinger's fifth assignment of error is meritless.

### Mootness

{¶77} In his sixth assignment of error, Basinger asserts:

{¶78} "The Court of Common Pleas Erred in its Determination That the Action has not Been Rendered Moot by Removal of the UST."

{¶79} Basinger asserts that he complied with all BUSTR regulations and received a "No Further Action" letter from BUSTR on January 15, 2008, rendering the Attorney General's action moot and non-justiciable.

{¶80} A case may be moot when there is no longer a "live" issue to be determined, or when "the parties lack a legally cognizable interest in the outcome." *Allen*

*v. totes/Isotoner Corp.*, 123 Ohio St.3d 216, 2009-Ohio-4231, 915 N.E.2d 622, at ¶17, quoting *Los Angeles Cty. v. Davis* (1979), 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642. An action is only moot when it would be impossible to provide meaningful relief even in a ruling in favor of the party seeking relief. Id. at ¶18. However, an action will not be moot if an actual controversy still exists between adverse litigants. *State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 517-518, 1997-Ohio-75, 687 N.E.2d 661.

**{¶81}** Basinger claims that the cessation of his non-compliant activity resolved any controversy between the parties, and argues that the Attorney General's action should have been dismissed before trial, citing as support the Ninth District's decision *Sabol v. Black* (Jan. 14, 1976), C.A. No. 2337. In a small portion of the *Sabol* decision, the Ninth District noted that the trial court could not enjoin an activity that the defendant had already ceased. Here, the trial court's judgment entry only imposed a civil penalty against Basinger, and did not impose an injunction.

**{¶82}** Seeking a civil penalty for Basinger's 2423 days of non-compliance was still a "live" issue from which the Attorney General could seek meaningful relief. See, e.g., *Kuntz v. Director of Ohio, EPA* (Aug. 21, 1998), 2d Dist. No. 16429 (remedy of environmental hazard did not moot the Ohio EPA's action for civil penalties based on non-compliance). The similar procedural history of *Dayton Malleable* demonstrates that the cause is still actionable. In *Dayton Malleable*, the Attorney General filed an action on March 24, 1978 for the defendant's failure to comply with regulations, seeking an injunction and civil penalties. *Dayton Malleable*, 1 Ohio St.3d at 152. The defendant came into compliance with regulations in November of 1978, thus before the case proceeded to trial on January 3, 1979. Id. The trial court in that case dismissed the injunction portion of the Attorney General's action due to mootness, and proceeded to assess $493,500 in civil penalties against the defendant. Id. at 152-153. The Ohio Supreme Court upheld the imposition of civil penalties. Id. at paragraph two of the syllabus.

**{¶83}** One of the purposes of civil penalties for violations of BUSTR regulations and similar environmental regulations is to deter future violations, both from the individual

defendant, and as an example to others. See, e.g., *Coen*, supra, at ¶9, 34. The language of R.C. 3737.882(C)(2) uses both the past and present tense to describe penalties for violations, which indicates that the statute provides authorization to impose penalties for currently occurring violations, as well as past violations. The plain language of the statute does not require that a violation continue to be actively occurring at the time of the imposition of the penalty. Although Basinger's compliance did have an effect on the lower court's decision by providing it with an end date for the penalty, it does not moot the issue of his prior 2423 days of non-compliance.

{¶84} Thus, Basinger's eventual compliance did not prohibit the exaction of fines for the period of violation. Basinger's sixth assignment of error is meritless.

### Manifest Weight of the Evidence

{¶85} In his first assignment of error, Basinger asserts:

{¶86} "The facts cited by the Court of Common Pleas are not supported by the record."

{¶87} Appellate review of a trial court's adoption of a magistrate's factual findings is "guided by the principle that judgments supported by competent, credible evidence must not be reversed, as being against the manifest weight of the evidence." *Miller-Yount Paving, Inc. v. Freeman Cargo Carrier, Inc.* (Mar. 30, 2000), 7th Dist. No. 98 CA 226, citing *Gerijo, Inc. v. Fairfield,* 70 Ohio St.3d 223, 226, 1994-Ohio-432, 638 N.E.2d 533; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. A reviewing court must operate under the presumption that the trial court's findings of facts are correct. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80-81, 10 OBR 408, 461 N.E.2d 1273.

{¶88} To support his overall claim that the decision was against the manifest weight of the evidence, Basinger attacks a number of factual findings related to his other five assignments of error. Many of Basinger's assertions take issue with the legal significance of facts that the parties otherwise generally agree upon.

{¶89} Basinger first asserts that no evidence had been presented demonstrating the presence of any petroleum product in the UST. Basinger points to the testimony that

he provided at trial, during which Basinger stated that the UST had been empty when he purchased the property in 1994. However, the magistrate's finding that "there was approximately 1.5 inches of diesel fuel remaining in the UST" referenced a 2006 BUSTR Compliance Inspection Report, which stated that there was "approx. 1.5 inches of diesel remaining in the tank." Additionally, Basinger's own 2001 registration application, as well as the 2003 Order of the Fire Marshal, both referred to the UST as containing petroleum. The trial court apparently found the Attorney General's evidence to be more credible. The evidence provided at trial therefore supported the trial court's decision.

{¶90} Basinger next asserts that the trial court's conclusion that Basinger, rather than various state agencies, was at fault for his failure to comply with BUSTR regulations was against the manifest weight of the evidence. However, the record contains competent, credible evidence that Basinger failed to comply with BUSTR regulations from 2001 to 2007. The Attorney General presented evidence that Basinger was notified that he was in violation of BUSTR regulations on March 19, 2001, that Basinger was given extra time to explore the options that would bring him into compliance and that Basinger failed to take action on any of those options from 2001 to 2003. The Attorney General presented evidence that the fire marshal issued Final Findings and Orders on September 25, 2003, citing Basinger for his continued noncompliance with BUSTR regulations, and providing Basinger with the sole option of removing the UST and paying a fine in order to remedy the violation. The Attorney General demonstrated that the Order of the fire marshal was appealable to the Environmental Review Appeals Commission, and that Basinger did not appeal the decision. The Attorney General demonstrated that Basinger did not remove the UST until 2007. Thus, the trial court's conclusion on the issue of compliance and fault for non-compliance was not against the manifest weight of the evidence.

{¶91} Basinger points out that he testified that a woman named Ms. Carter told Basinger in 2006 that "they messed up [his 2005 change in service] application," and argues that this statement by Ms. Carter constituted an admission by the appellee that the appellee was at fault for Basinger's noncompliance. Both sides agree that Basinger

may have received mixed messages about the feasibility of his 2005 change in service application from different bureaus within the Division of the Fire Marshal.  However, as explained, Basinger took no action to proceed with a change in service.  Thus any factual findings about who may have made mistakes, if any, during Basinger's 2005 change in service application process did not have any effect on the trial court's decision.

**{¶92}**  Basinger next asserts that the trial court's calculation of damages did not conform to the evidence presented at trial.  As discussed above, the trial court had the broad discretion to fix a penalty in any amount less than $10,000.00 per day of violation.

**{¶93}**  Basinger argues that the lack of actual environmental harm from the UST functioned as a complete defense to the imposition of civil penalties.  However, as discussed, proof of actual damages is not a requirement for the imposition of civil penalties for a violation of BUSTR regulations.  Basinger also argues that the Attorney General did not prove its enforcement costs to support the $35 per day awarded.  However, the $35 per day amount was not a damages award, but was a penalty which took into consideration not only the expenditures and efforts of BUSTR, but any other relevant factor, such as the additional three factors of the EPA's Penalty Policy considered by the trial court.  Basinger further argues that the cost he incurred in order to remove the tank should be subtracted from the penalty amount.  This does not make argument with any factual issue, and is instead a repetition of one of Basinger's legal arguments in his fourth assignment of error, and the government is not obligated to compensate Basinger for expenditures that he is required to make in order to comply with Ohio law.

**{¶94}**  The trial court determined that Basinger was out of compliance with BUSTR regulations and orders from the notification of violation on March 19, 2001, until Basinger's removal of the UST on November 6, 2007, for 2423 days of noncompliance.  As described above, this was supported by evidence presented by both parties at trial.  Basinger argues that he should at most be penalized for 363 days of noncompliance because he was not notified of the rejection of his change in service permit application until November 22, 2006.  However, as discussed, the permit had long expired by

November of 2006, and Basinger's complete failure to proceed under BTR's permission in April of 2005 indicates that he continued to be noncompliant even in the event that he was genuinely misinformed. The trial court's decision that Basinger was not in compliance with BUSTR regulations for the entire 2423 day period was therefore supported by some competent credible evidence.

{¶95} The Attorney General presented testimony that Basinger's UST was in proximity to drinking water sources, which was not refuted. Moreover, the 2001 Compliance Inspection Report stated that the UST, containing some petroleum, had been out of use since at least 1997, and had no release detection method in use, no maintenance of a required corrosion protection system, and was basically unmonitored, which would seem to present a general risk of leakage and, at the very least, potential contamination of surrounding soils. Basinger testified that he incurred $8,000.00 in out-of-pocket expenses when he removed the UST in November of 2007. The Attorney General presented evidence that various government employees were engaged to inspect Basinger's property on three different occasions, formulate a compliance plan, receive Basinger's correspondence, perform research, send correspondence, process Basinger's tardy attempt to obtain a change-in-service permit, review and verify Basinger's closure assessment, all during the 2001 through 2007 time period.

{¶96} Pursuant to the guidance of the Penalty Policy referenced in *Dayton Malleable*, the trial court found that the risk of harm to nearby drinking water wells, Basinger's delays spanning over six years, the efforts of over ten BUSTR employees over that span of time to obtain compliance from Basinger, and the economic benefit to Basinger in delaying the expenditure of $8,000.00 by over six years, all supported the decision to impose the Attorney General's requested penalty of $35 per day, for a total of $84,805. There was some competent credible evidence supporting the trial court's findings regarding each of the Penalty Policy factors, and therefore supporting the trial court's assessment of the penalty amount.

{¶97} Basinger finally asserts that the trial court's finding that a valid trust did not exist was unsupported by the evidence, and as a result, the trial court erroneously

concluded that Basinger was a proper defendant in this action. As discussed, trust formation in this particular case does not have any effect on the legal issue of Basinger's liability for BUSTR violations. Thus, the trial court's finding that Basinger was a proper defendant was not against the manifest weight of the evidence.

{¶98} In summary, the trial court's findings that Basinger was a proper party defendant, that he was in violation of BUSTR regulations for 2423 days, and that he should pay a civil penalty of $35.00 per day were supported by some competent credible evidence. The trial court's decision was not against the manifest weight of the evidence. Accordingly, Basinger's first assignment of error is meritless.

{¶99} In conclusion, the trial court did not abuse its discretion in adopting the magistrate's calculation of $84,405.00 in civil penalties against Basinger. The trial court's decision was not against the manifest weight of the evidence, and Basinger's assignments of error regarding the presence of petroleum in the UST, impossibility of compliance, penalty amount, trust formation, and mootness are meritless. Accordingly, the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Waite, J., concurs.