THE STATE, EX REL. BROWN, ATTY. GEN., APPELLANT AND APPELLEE, *v.* DAYTON MALLEABLE, INC., APPELLEE AND APPELLANT.

[Cite as State, ex rel. Brown, *v.* Dayton Malleable (1982), 1 Ohio St. 3d 151.]

(No. 81-1134—Decided August 4, 1982.)

*Mr. William J. Brown,* attorney general, *Ms. Martha E. Horvitz* and *Mr. E. Dennis Muchnicki,* for appellant and appellee.

*Messrs. Bricker & Eckler, Mr. Gerald L. Draper, Mr. Marshall L. Lerner* and *Mr. Richard T. Taps,* for appellee and appellant.

LOCHER, J. Each party raises a distinct issue. The state argues that the Court of Appeals erred by holding that the schedule of compliance is not an enforceable term or condition of the NPDES permit. DMI contends that the trial court erred by admitting evidence pertaining to DMI's financial condition. We agree with the state that a schedule of compliance is an enforceable term or condition of an NPDES permit. Otherwise, we affirm the Court of Appeals.

## I.

R.C. Chapter 6111 embodies the response of the General Assembly to the Federal Water Pollution Control Act Amendments of 1972. See R.C. 6111.01(L); Section 1342(b), Title 33, U.S. Code. The goal of the federal Act is "eliminating 'the discharge of pollutants into the navigable waters,' 33 U.S.C., Section 1251(a)(1) * * *." *EPA* v. *National Crushed Stone Assn.* (1980), 449 U.S. 64, 69.[3]

Ohio's participation in this effort includes the power of the Director of Environmental Protection ("director") to: "Issue, revoke, modify, or deny permits for the discharge of sewage, industrial waste, or other wastes into the waters of the state, and for the installation or modification of disposal systems or any parts thereof in compliance with all requirements of the 'Federal Water Pollution Control Act' and mandatory regulations adopted thereunder, and *set terms and conditions of permits, including schedules of compliance,* where necessary." (Emphasis added.) R.C. 6111.03(J). R.C. 6111.01(K) defines a "schedule of compliance" as "a schedule of remedial measures including an enforceable sequence of actions or operations leading to compliance with standards and rules adopted under sections 6111.041 and 6111.042 of the Revised Code or compliance with terms and conditions of permits set under division (J) of section 6111.03 of the Revised Code."

The trial court noted that DMI had admitted violations of R.C. Chapter 6111. "No person shall violate or fail to perform any duty imposed by sections 6111.01 to 6111.08 of the Revised Code, or violate any order, rule, or term or condition of a permit issued by the director of environmental protection pursuant to such sections. Each day of violation is a separate offense." R.C. 6111.07(A). R.C. 6111.09 establishes a range of penalties for violations and provides, in part: "Any person who violates section 6111.07 of the Revised Code shall pay a civil penalty of not more than ten thousand dollars per day of violation, to be paid into the state treasury to the credit of the general revenue fund. * * * Any action under this section is a civil action * * *." The Court of Appeals, however, determined that these provisions were not a sufficient

---

[3] The United States Supreme Court outlined the structure of the federal Act in 449 U.S., at 69 *et seq.*

basis for assessing a penalty. That court concluded, in its decision on the state's motion for reconsideration, that the schedule of compliance was in the nature of an "agreement" between the director and DMI, not a term or condition of the permit. In light of the ability of the director to revoke or modify the permit, R.C. 6111.03(J), the Court of Appeals reasoned that a "strict construction" of the penalty provisions of R.C. Chapter 6111 would prohibit imposing "a penalty for delay in the performance of steps in the schedule of compliance." We disagree.

### I A.

"Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning there is no occasion for resorting to rules of statutory interpretation. An unambiguous statute is to be applied, not interpreted." *Sears* v. *Weimer* (1944), 143 Ohio St. 312 [28 O.O. 270], paragraph five of the syllabus, quoted with approval in *State* v. *American Dynamic Agency* (1982), 70 Ohio St. 2d 41, 45 [24 O.O.3d 90]. See, also, R.C. 1.49. R.C. 6111.03(J) clearly empowers the director to "set terms and conditions of permits, *including schedules of compliance * * *.*" (Emphasis added.) "Include" is a common word meaning "to place, list, or rate as a part or a component of a whole or of a larger group, class, or aggregate." Webster's Third New International Dictionary. See, also, R.C. 1.42. The language of R.C. 6111.03(J), therefore, clearly articulates the intention of the General Assembly that schedules of compliance be considered as terms and conditions of permits.

### I B.

If construction of the statutes were necessary, however, we could reach the same conclusion. "It is by now a commonplace that 'when faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.' *Udall* v. *Tallman,* 380 U.S. 1, 16 (1965). * * *" *EPA* v. *National Crushed Stone Assn., supra,* at 83. 40 CFR 122.8(a) expresses the clear policy of the USEPA that schedules of compliance are conditions of NPDES permits and provides, in part: "In addition to conditions required in all permits for all programs (§ 122.7), the [State] Director shall establish conditions, as required on a case-by-case basis, in permits for all programs under * * * [Section] 122.10(a) (schedules of compliance) * * *." This administrative regulation also reflects the intent of Congress that schedules of compliance be treated as conditions of permits. See Section 1362(11) ("effluent limitation"), (17) ("schedule of compliance"), Title 33, U.S. Code. "An NPDES permit serves to transform generally applicable effluent limitations and other standards—including those based on water quality—into the obligations (including a timetable for compliance) of the individual discharger, and the Amendments provide for direct administrative and judicial enforcement of permits. §§ 309 and 505, 33 U.S.C. §§ 1319, 1365 (1970 ed., Supp. IV). * * * In short, the permit defines, and facilitates compliance with and enforcement

of, a preponderance of a discharger's obligations under the Amendments." *EPA* v. *State Water Resources Control Bd.* (1976), 426 U.S. 200, 205.

Accordingly, we hold that schedules of compliance are terms or conditions of NPDES permits issued under R.C. Chapter 6111. The parties agreed before the trial court that EPA policy permitted the assessment of a penalty for recalcitrance and indifference. See 13 ERC 2189, 2192-93. Therefore, the trial court did not err by assessing a penalty under R.C. 6111.07(A) and 6111.09 for DMI's recalcitrance and indifference toward meeting the requirements of the schedule of compliance.

## II.

DMI argues that the trial court erred by admitting evidence of DMI's financial condition. We disagree.

This cause was tried to the court. At trial, DMI's counsel argued that the court should first calculate the amount of the penalty and then consider whether that amount would bankrupt DMI. For this reason, DMI argued, the evidence of financial condition was inadmissible. The trial court agreed with DMI's rationale but disagreed with its conclusion. That is, the court decided to admit the evidence of financial condition[4] at trial and to "use it in the proper manner" later.

It is fundamental that evidence that is admissible for one purpose may be inadmissible for another purpose. See Fed. Evid. R. 105. DMI has argued throughout this case that evidence of financial condition is admissible for the purpose of determining whether the civil penalty assessed by the court would result in bankruptcy. Initially, the trial court admitted this evidence for that purpose. The state contends that a civil penalty should also be of sufficient amount to deter future violations. The trial court accepted this reasoning as well. Under either analysis, the evidence is admissible. The question, however, becomes whether the court used it properly. See Giannelli, Ohio Evidence Manual, Author's Comment, 25-26, Section 105.01 (1982), citing 21 Wright & Graham, Federal Practice and Procedure, Section 5067.

The trial court did, indeed, use this evidence properly. The court's opinion reflected a detailed analysis and calculation of the penalty in light of USEPA policy. 13 ERC 2189, 2193-95. *Then,* the court considered the evidence of financial condition.

"As [*sic*] this point DMI may well ask why the civil penalty here assessed is so much greater than that assessed in *U.S.* v. *Velsicol Chemical Corp.* * * * [(D.C., W.D. Tenn., 1978), 8 ELR 20745], where from the facts given in the

---

[4] The state introduced its evidence through exhibits, DMI's financial statements, and a qualified financial expert. The evidence of approximate after-tax income and dividends was: in 1978, $2.2 million income, $2 million dividends; in 1977, $5.9 million income, $2.2 million dividends; in 1976, $7.7 million income, $2 million dividends; and in 1975, $6.3 million income, $1.8 million dividends. From this and other evidence, the expert concluded that a penalty in an amount greater than $125,000 but less than $1,250,000 would have a material effect on DMI and would require reporting by DMI's auditors.

report of that case the violations there were more severe than they were in the case at bar. The answer lies in the comparative size of the enterprises concerned. As indicated previously, the report of Velsicol does not indicate the size of that business. The same can be said of other cases cited by DMI. A $30,000 civil penalty against DMI, considering its size, would amount to little more than 'a slap on the wrist,' while it might throw a small enterprise out of business. *U.S.* v. *J. B. Williams Co., supra* [(C.A. 2, 1974), 498 F.2d 414]. The penalty is supposed to be a deterrent to violation, insofar as the violator is concerned, and an example to others, not just an effluent or discharge fee which might be considered nothing more than the cost of doing business. *U. S.* v. *ITT Continental Baking Co.,* 420 U.S. 223, 231 * * *; *U. S.* v. *Papercraft Corp.,* 393 F. Supp. 408, 420. Thus, DMI's ability to pay is a significant factor." 13 ERC, at 2195. The trial court, therefore, used the evidence of financial condition merely to insure that the penalty it had calculated would not be so large as to send DMI into bankruptcy but would be large enough to deter future violations. That is, the court *did not,* as DMI argues, increase the penalty because of DMI's solid financial condition.

Federal courts have also observed that civil penalties serve to deter future violations of the Federal Water Pollution Control Act. See *United States* v. *Atlantic Richfield Co.* (E.D. Pa. 1977), 429 F. Supp. 830, 841, affirmed *sub. nom. United States* v. *Gulf Oil Corp.* (C.A. 3, 1978), 573 F. 2d 1303, and the Federal Trade Commission Act. See *United States* v. *ITT Continental Baking Co.* (1975), 420 U.S. 223, 231-32; *United States* v. *Swingline, Inc.* (E.D. N.Y. 1974), 371 F. Supp. 37, 47; *United States* v. *J. B. Williams Co., Inc.* (S.D. N.Y. 1973), 354 F. Supp. 521, 548, affirmed in part and reversed in part in 498 F. 2d 414. One commentator has stated succinctly the principle as applicable to water pollution cases: "[B]ecause the function of a monetary penalty is to *deter* the polluting activity altogether and thus not give rise to the penalty at all, the amount of the penalty must be *greater than* abatement or compliance costs." (Emphasis *sic.*) Notes, Assessment of Civil Monetary Penalties for Water Pollution: A Proposal for Shifting the Burden of Proof Regarding Damages, 30 Hastings L. J. 651, 670.

R.C. 6111.09 permits a penalty of $10,000 or less for each day of violation. Both parties agreed that USEPA policy should be the standard for determining the amount of penalty. See 13 ERC 2189, 2193. So long as the amount assessed is less than $10,000 per day of violation, discretion to fix that amount lies in the trial court. Cf. *United States* v. *Ancorp National Services, Inc.* (C.A. 2, 1975), 516 F. 2d 198, 202; *United States* v. *J. B. Williams Co., Inc., supra* (498 F. 2d 414), at 438. If the trial court had assessed the maximum penalty for each day of violation, the total penalty would have been approximately $7,000,000. Instead, the amount assessed was less than ten percent of that figure and in the lower third of the range in which the penalty could, according to expert testimony, be expected to have a material effect. In assessing the penalty, the trial court did not demonstrate an " 'unreasonable, arbitrary or unconscionable attitude.' " See *Dayton, ex rel. Scandrick,* v. *McGee* (1981),

67 Ohio St. 2d 356, 359 [21 O.O.3d 225].[5] The court, therefore, did not abuse its discretion.

Accordingly, we reverse the holding of the Court of Appeals that the schedule of compliance was not a term or condition of DMI's NPDES permit and remand the cause to the Court of Appeals for further proceedings consistent with this opinion.

*Judgment accordingly.*

CELEBREZZE, C.J., W. BROWN and SWEENEY, JJ., concur.

HOLMES, C. BROWN and KRUPANSKY, JJ., concur in part and dissent in part.

HOLMES, J., concurring in part and dissenting in part. I agree with the statement of law contained in paragraph one of the syllabus, and the reasoning by which the majority reaches it. Additionally, I agree with paragraph two of the syllabus as I do not doubt that a civil penalty was properly imposed upon DMI. However, I disagree with the amount of the penalty and the manner in which it was reached, so I must dissent.

The trial court imposed a penalty of $493,500 upon DMI. As the majority points out, this amount may be divided among three categories: $8,000 for economic benefit derived from its tardiness, $34,150 for environmental harm[6] and more than $450,000, in excess of 90 percent of the total fine, for "recalcitrance." Since the major portion of this penalty is for recalcitrance, it is recalcitrance to which I turn.

The measure of DMI's recalcitrance is gleaned by not merely examining its failure to comply in the present instance, but by examining its entire record at the Ironton facility. Prior to undertaking the present projects, DMI was in the midst of installing a $13 million cupola melting facility designed to insure that an increase in the production of hot metal would meet Ohio EPA air and water standards. Of this amount, $500,000 was spent to assure that

[5] DMI makes a passing reference in its brief to the prohibition against "excessive fines" in Section 9 of Article I of the Ohio Constitution. DMI does not, however, explain why we should apply this language in the civil context. We note that the Eighth Amendment to the United States Constitution contains identical language, and that the entire amendment applies only to criminal cases. *Ingraham* v. *Wright* (1977), 430 U.S. 651. Furthermore, penalties assessed for discharge of oil into navigable waters under the Federal Water Pollution Control Act, Section 1321(b)(6), Title 33, U.S. Code, do not trigger the federal constitutional protection afforded to a criminal defendant. *United States* v. *Ward* (1980), 448 U.S. 242, rehearing denied in 448 U.S. 916.

[6] This figure is based more upon a hunch than the facts. The trial court admitted that "DMI's pollutant in and of itself would have little effect on water quality." Indeed, DMI's failure to comply resulted in the release of no toxic chemicals, heavy metals or carcinogens. It created no particular health hazard. Compare *United States* v. *Velsicol Chemical Corp.* (W.D.Tenn. 1978), 8 E.L.R. 20745; *California* v. *San Francisco* (1979), 94 Cal.App. 3d 522, 156 Cal. Rptr. 524.

outfall 003[7] complied with DMI's NPDES permit. This entire project was the largest ever undertaken at the Ironton facility. For its efforts in improving air quality by installing the cupola, DMI received awards from the Ohio EPA, the Heart and Lung Associaton and the Portsmouth Health Department. Recalcitrance should be made of sterner stuff.

This story of performance must be contrasted with the inability to timely comply here. The major problem was outfall 001. DMI was about 16 months behind its compliance schedule for outfall 001. The total spent to assure compliance at outfall 001 was $87,000 — · less than 20 percent of that spent to assure *timely* compliance at outfall 003. What economic benefit did DMI derive from its tardiness? The trial court found that DMI saved $8,000 because of its failure to timely comply.

This all leads to the inescapable conclusion that the record does not support the imposition of the $450,000 penalty for recalcitrance and indifference. Rather, the penalty is both unreasonable and excessive in light of all DMI's efforts to assure that it will not pollute.

However, both the majority and the trial court justify the imposition of the penalty here by doing what they strenuously claim they are not: relying upon DMI's size and financial ability to pay.

DMI timely objected to the admissibility of evidence of its financial condition. This objection was overruled. The trial court considered this evidence in assessing the penalty. Accordingly, in its opinion, the trial court stated that "DMI's ability to pay is a significant factor" in the determination of the appropriate penalty; and in its decision and entry on defendant's motion for new trial the trial court stated that "one of the key factors involved in determining the amount of the penalty is the size of the enterprise involved." The admission and use of this evidence in the assessment of the penalty was prejudicial error.

The trial court, and the majority here, justify the utilization of DMI's financial data upon the basis that the large penalty deters future violation and serves as an example to others so that the penalty will not be considered as a discharge fee. This approach for requiring compliance is not intended by the Clean Water Act. See *Lloyd A. Fry Roofing Co.* v. *Texas* (Tex. Civ. App. 1975), 524 S.W. 2d 313.

It is universally agreed that the purpose of the civil penalty provisions of R.C. Chapter 6111 and similar provisions enacted in other states in accordance with the Federal Water Pollution Control Act is remedial and not punitive. In *United States* v. *J. B. Williams Co.* (S.D.N.Y. 1973), 354 F. Supp. 521, 530, affirmed in part and reversed in part on other grounds (C.A. 2, 1974), 498 F. 2d 414, the court stated:

"Where the sanction seeks to compel the person subject to it to do what he is legally required to do, the sanction is neither punitive nor criminal, but simply remedial in purpose."

---

[7] Work on outfall 003 was completed four months ahead of schedule.

One commentator has noted:

"A civil penalty is simply a monetary sum that is assessed and recovered in a civil proceeding for a violation of law. Although the civil penalty may be viewed as a sanction in the sense that it is imposed to produce obedience to environmental laws, it is not designed to punish the violator. Its purpose is deterrence or compensation, not retribution." Marshall, Environmental Protection and the Role of the Civil Money Penalty: Some Practical and Legal Considerations, 4 Environmental Affairs 323, 330-331.

In this case, the penalty of $493,500 is clearly punitive in nature. The trial court found the economic benefit to DMI resulting from its delayed compliance at outfall 001 to have been only $8,000 (the total cost of the project at that outfall was only $87,000). The trial court found the environmental harm caused by DMI to be fairly compensated for by a fine of $34,150. A fine over 62 times the economic benefit derived by DMI and over 14 times the amount assessed for environmental harm can have no purpose other than punishment.

The trial court's imposition of this enormous penalty is not only contrary to the policies of the specific statutes involved, but is contrary to established principles governing the imposition of penalties.

"It is well established that penalties are not favored in either law or equity and should be imposed only when clearly justified." *State, ex rel. Reed,* v. *Indus. Comm.* (1965), 2 Ohio St. 2d 200, 203 [31 O.O.2d 408].[8]

The trial court assessed the amount of the fine, beyond that portion of the fine for economic benefit and environmental harm, for "recalcitrance, defiance or indifference." The EPA civil penalty policy provides for the addition of an amount for recalcitrance, defiance and indifference to the other portions of a fine. However, in calculating with mathematical rigidity an amount for "recalcitrance, defiance and indifference" under the EPA civil penalty policy, the trial court failed to consider that the purpose of any fine must be deterrence and not punishment. The amount assessed should be an amount sufficient to deter the "recalcitrance, defiance and indifference" shown, not to punish for it.

Federal cases have also noted that while the penalties are to deter violations, they are not to be punitive in nature.[9] In *United States* v. *Detrex Chemical Industries, Inc.* (N.D. Ohio 1975), 393 F. Supp. 735, the court narrowly interpreted the penalty provision to avoid a punitive application:

"The court further concludes that while a $10,000 per violation per day penalty would also tend to effectuate the Congressional enforcement purpose, the truly devastating impact of such a construction on business is not what

---

[8] See, also, *Brown* v. *Executive 200, Inc.* (1980), 64 Ohio St. 2d 250 [18 O.O.3d 446]. Further, the state may seek punitive sanctions for truly outrageous behavior by requesting criminal penalties. See R.C. 6111.99.

[9] State courts have similarly interpreted their civil penalty provisions. See, *e.g., Southern Ill. Asphalt Co., Inc.,* v. *Pollution Control Bd.* (1975), 60 Ill. 2d 204, 326 N.E. 2d 406; *Lloyd A. Fry Roofing Co.* v. *Texas, supra.*

Congress intended. Such a rule would tend more towards confiscation than mere deterrence." *Id.* at page 738.

A civil penalty under the Clean Water Act was not designed to be "punitive in either purpose or effect." *United States* v. *Ward* (1980), 448 U.S. 242, 251 (as applied to oil spill provision, Section 1321[b][6], Title 33, U.S. Code). A penalty based on deterrence represents the amount necessary to prevent future violations. The penalty may incidentally punish the offender, but its principal goals are compensation and deterrence. The civil penalty "is aimed less at the *acts* of polluters than at the resulting pollution itself." *United States* v. *General Motors Corp.* (D. Conn. 1975), 403 F.Supp. 1151, 1162. DMI and other potential violators of the Clean Water Act are "rational, profit-maximizing entities," and therefore an analysis of their financial condition is unnecessary to determine the amount necessary for deterrence. If the penalty assessed exceeds the amount of economic benefit incurred from delayed compliance, such companies will choose not to pollute.

The purposes of R.C. 6111.09 are to compensate society for the harm caused by pollution and to deter violations. The financial worth of a defendant has no relation to either of these purposes. First, DMI's ability to pay is unrelated to the offense committed. Its wealth is not relevant to determining an amount necessary to deter further violations because it is unrelated to any actions or inactions. Second, the amount required to compensate society for a defendant's violations of its permit would be the same regardless of the size of the defendant. Third, although evidence of financial wealth is admissible in an action in which punitive damages are allowed, R.C. 6111.09 is not intended to be punitive. Fourth, there is no evidence in the record that a greater fine must be imposed on a larger corporation to deter it from future violations. In fact, "although monetary penalties are widely used in both the civil and criminal law, little empirical research has been done as to their impact on those they are intended to deter." 2 Recommendations and Reports of the Administrative Conference of the United States 916 (July 1, 1970-December 31, 1972). Since evidence of the wealth of the defendant is admissible only in cases where wealth is necessarily involved in determining damages, such as in actions for defamation or injury to reputation, 21 Ohio Jurisprudence 2d, Evidence, Section 220, it was error to admit evidence of the financial condition of DMI because its financial worth is not "necessarily involved" in determining the penalty under R.C. 6111.09.

Accordingly, I would reverse the trial court's determination of a penalty and remand for new findings.

C. BROWN and KRUPANSKY, JJ., concur in the foregoing concurring and dissenting opinion.