[Cite as *State ex rel. Ohio Atty. Gen. v. Shelly Holding Co.,* 135 Ohio St.3d 65, 2012-Ohio-5700.]

THE STATE EX REL. OHIO ATTORNEY GENERAL, APPELLEE, *v.* SHELLY

HOLDING COMPANY ET AL.; SHELLY MATERIALS, INC., ET AL., APPELLANTS.

[Cite as *State ex rel. Ohio Atty. Gen. v. Shelly Holding Co.,*

135 Ohio St.3d 65, 2012-Ohio-5700.]

*Air-pollution control—42 U.S.C. 7413(e)(2)—Continuing violations—R.C.*
*3704.05—Penalties.*

(No. 2011-0252—Submitted November 16, 2011—Decided December 6, 2012.)

APPEAL from the Court of Appeals for Franklin County,

No. 09AP-938, 191 Ohio App.3d 421, 2010-Ohio-6526, 946 N.E.2d 295.

_____

CUPP, J.

{¶ 1} This appeal asks us to determine the proper method of calculating the civil penalty to be levied against an industrial facility for noncompliance with the terms of its air-pollution-control permit. The appellate court concluded that according to the terms of the Shelly Materials, Inc., permits, the penalty is to be calculated from the initial date of noncompliance until the facility demonstrates that it no longer violates the permits.

{¶ 2} We conclude that the appellate court reached the proper conclusion in this matter, and therefore, we affirm the judgment of the court of appeals.

**I. Factual and Procedural Background**

*a. Shelly Company*

{¶ 3} The Shelly Company is an Ohio corporation engaged in the business of surfacing roads. It owns several subsidiaries, including appellants Shelly Materials, Inc., and Allied Corporation (collectively, "Shelly").[1] Shelly

_____

1. The original defendants in the state's complaint were the Shelly Holding Company, the Shelly Company, Shelly Materials, Inc., Allied Corporation, and Stoneco, Inc. At the close of the state's

owns multiple hot-mix asphalt facilities in Ohio that support its road-surfacing activities.

**{¶ 4}** The hot-mix asphalt facilities release pollutants into the air, such as particulate matter, carbon monoxide, nitrogen oxides, sulfur dioxide, and volatile organic compounds. The facilities are regulated by the Ohio Environmental Protection Agency ("Ohio EPA") pursuant to air-pollution-control permits issued to Shelly.

### b. *The Air-Pollution-Control Permits*

**{¶ 5}** The air-pollution-control permits issued to Shelly have a variety of requirements with which Shelly must comply, including terms that specify the emission limits for the applicable types of pollutants, set operational restrictions, and establish monitoring, recordkeeping, and reporting requirements.

**{¶ 6}** The permits also prescribe the testing method each Shelly facility must use to establish its compliance with the permit's emission limit for each pollutant. The prescribed testing method is set forth at Part II, Section (E) of the permits, and specifies:

E. Testing Requirements

1. Compliance with the emission limitations specified in Section A.I of these terms and conditions shall be determined in accordance with the following methods:

a. Emissions Limitation:

* * *

Applicable Compliance Method:

---

case, the Shelly Holding Company and the Shelly Company were dismissed. As relevant to the issues presented in this appeal, only Shelly Materials, Inc., and Allied Corporation are involved.

The permittee shall conduct, or have conducted, emission testing for this emissions unit in accordance with the following requirements:

\* \* \*

iv. The test(s) shall be conducted while the emissions unit is operating at or near its maximum capacity, burning on-spec oil and using virgin materials, unless otherwise specified or approved by the Central District Office.

Each air-pollution-control permit further provides that the Shelly permit holder "shall remain in full compliance with all applicable State laws and regulations and the terms and conditions of this permit."

{¶ 7} In 2002 and 2006, five of Shelly's hot-mix asphalt facilities performed the facility testing as required by their permits. During the facility testing, these five hot-mix asphalt facilities emitted pollutants in excess of the allowable emission limit set forth in the permits and, in doing so, failed to comply with the maximum-capacity stack-test ("stack-test") requirement of the permit.[2]

### c. Trial Court Decision

{¶ 8} In July 2007, the state of Ohio, by and through the attorney general, filed suit for injunctive relief and civil penalties. The complaint presented 20 claims for relief. In the complaint, the state alleged that the companies had violated state law and Ohio's federally approved plan for the implementation, maintenance, and enforcement of air-quality standards as required by the federal Clean Air Act, when it

---

2. In each of the five instances, Shelly ultimately remedied the permit violation. Three facilities obtained a modified permit from the Ohio EPA increasing the allowable emission limit. One facility conducted another test and met the emission limit contained in the permit. Another facility also complied with the emission limit contained in the permit upon subsequent testing, but Shelly nevertheless requested a modified permit from the Ohio EPA to increase the allowable emission limit.

installed and thereafter operated new sources of air pollution without obtaining appropriate permits, modified and thereafter operated existing sources of air pollution without obtaining appropriate permits, exceeded air pollutant emission limitations, burned fuel containing excessive levels of mercury, lead and other hazardous chemical constituents, and violated the terms and conditions of applicable air pollution permits.

The state did not allege any violations, or seek to enforce any provision, of the federal act.

{¶ 9} The state's seventh claim for relief alleged that in 2002 and 2006, the Shelly facilities emitted pollutants in excess of the allowable emission limit set forth in the permits and, in doing so, failed to comply with the stack-test requirement. The state alleged that the Shelly facilities violated R.C. 3704.05(C), which provides that "no person who is the holder of a permit * * * shall violate any of the permit's terms or conditions."

{¶ 10} Shelly entered into stipulations with the state in which Shelly admitted liability to various claims in the complaint and acknowledged that when it conducted the stack testing, its facilities emitted pollutants in excess of the allowable amounts set forth in the permits and the facilities violated their respective permits. After a bench trial, the court issued a decision finding for the state on some, but not all, claims for relief. On the state's seventh claim for relief, the only claim relevant here, the court acknowledged that Shelly did not dispute that on the days of stack testing in which the emissions exceeded the limits set forth in the permits, the permits were violated. The court accepted Shelly's stipulations as findings of fact.

{¶ 11} In determining the appropriate penalty, the trial court acknowledged that the question remaining to be decided was whether, for purposes of calculating the penalty, the violation should be deemed to have occurred only on the day the facility failed the stack tests and emitted in excess of the permitted emission limitation or whether the violation should be presumed to be continuing until a new stack test demonstrated compliance with the permit.

{¶ 12} The trial court concluded that the violation occurred only on the day on which the facility failed the stack tests. The court accepted Shelly's argument that the conditions under which Shelly conducted the required stack tests did not represent the facilities' normal operating conditions and that it operated its facilities within the permitted emission limits. Therefore, the court concluded, it was not reasonable to infer that the violation continued for every day thereafter until a subsequent emission test demonstrated compliance. The court assessed a civil penalty of $4,500 on the seventh claim for relief and a total of $350,123.52 on all claims.

### d. Appellate Court Decision

{¶ 13} The state appealed and challenged the manner in which the trial court had calculated the civil penalties. The state asserted that the penalty should be assessed for each day a facility was out of compliance with its permit, which would be from the day it failed the stack testing and continuing until the facility demonstrated that it no longer failed the stack test as required by the permit. Under the state's rationale, the time period for calculating the penalty commenced on the day that the stack test was conducted and showed that the facility exceeded the allowable emission limit of its permit. The last penalty day, according to the state, could be (1) the day on which the facility conducts a subsequent maximum-capacity test and the facility emissions are within the allowable limits of the permit, (2) the day on which the Ohio EPA issues a new permit for the facility with revised emission limits that are the same as or greater than the emission

released on the day when the facility conducted its initial emission test, or (3) the day on which the facility could show that it *would* pass a subsequently conducted maximum-capacity test because intervening facility modifications were made.

{¶ 14} The appellate court sustained the state's assignment of error in this regard and remanded the matter to the trial court for recalculation of the fine, in its discretion. 191 Ohio App.3d 421, 2010-Ohio-6526, 946 N.E.2d 295, ¶ 66.[3]

{¶ 15} Thereafter, we accepted Shelly's appeal under our discretionary jurisdiction. 128 Ohio St.3d 1481, 2011-Ohio-2055, 946 N.E.2d 240.

## II. Air-Pollution-Control Legislation

{¶ 16} The principal federal legislation in this matter is the Clean Air Act, 42 U.S.C. 7401 et seq., which is intended "to protect and enhance the quality of the Nation's air resources" and to encourage pollution prevention through reasonable federal, state, and local governmental actions. 42 U.S.C. 7401(b)(1) and (c). Pursuant to the authority of the Clean Air Act, the administrator of the United States Environmental Protection Agency ("EPA") establishes national standards for air quality and certain types of air pollutants. 42 U.S.C. 7409(a)(2) and (b)(1); 40 C.F.R. 50.1 through 50.17. The act also requires that the states adopt and submit to the administrator a plan for specifying how these air-quality standards will be achieved and maintained. 42 U.S.C. 7407(a) and 7410(a). The act anticipates that states will achieve the air-quality standards through use permits, enforcement, and emission monitoring. 42 U.S.C. 7410(a). Enforcement and penalty-calculation provisions are set forth at 42 U.S.C. 7413.

{¶ 17} The purposes of Ohio's Air Pollution Control Act, R.C. Chapter 3704, are "to protect and enhance the quality of the state's air resources" and "to

---

3. In addition to presenting to the appellate court an assignment of error challenging the trial court's calculation of civil penalties, the state presented three additional assignments of error. 191 Ohio App.3d 421, 2010-Ohio-6526, 946 N.E.2d 295, ¶ 4. The remaining assignments of error were each sustained at least in part, and the appellate court's disposition was to affirm the trial court's judgment in part, reverse it in part, and remand the cause "for further proceedings in accordance with law and consistent with" the appellate court's decision. *Id*. at ¶ 68.

enable the state, through the director of environmental protection, to adopt and maintain a program for the prevention, control, and abatement of air pollution that is consistent with the federal Clean Air Act."  R.C. 3704.02(A)(1) and (2).  Ohio's Air Pollution Control Act states that it is to be construed consistently with the federal Clean Air Act.  R.C. 3704.02(B).

{¶ 18} The director of the Ohio EPA is vested with the authority to administer R.C. Chapter 3704.  The director is authorized to, among other things, (1) adopt air-quality standards for the state that are no more stringent than counterpart federal standards, (2) adopt emissions-standard rules necessary to meet those standards, (3) adopt rules requiring installation permits from the director as a prerequisite to constructing new sources of air pollution, (4) adopt rules prohibiting the operation of air-contaminant sources without either a permit to operate in compliance with applicable rules or a variance issued by the director, (5) adopt rules pertaining to the issuance, revocation, modification, or denial of variances that authorize emissions in excess of the applicable emission standards, (6) require operators of pollution sources to monitor emissions or air quality and to provide such reports as the director prescribes, and (7) enter upon private or public property for the purpose of making inspections, taking samples, and examining records or reports to ascertain compliance with air-pollution statutes, regulations, or orders.  R.C. 3704.03(D), (E), (F), (G), (H), (I), and (L).

{¶ 19} The Ohio EPA director has established administrative rules requiring air-contaminant sources[4] to have either a permit to operate or a variance

---

4. "Air contaminant source" means "each separate operation, or activity that result or may result in the emission of any of the following air contaminants:

> (1) An air contaminant or precursor of an air contaminant for which a national ambient air quality standard has been adopted under the Clean Air Act.
> (2) An air contaminant for which the source is regulated under the Clean Air Act.
> (3) A toxic air contaminant for which the source is regulated under the Clean Air Act.

and has adopted rules that govern allowable emissions. Ohio Adm.Code 3745-31-02(A) and 3745-31-09 and Chapters 3745-15 through 3745-26. Variances afford an exemption from the permit-to-operate requirement and authorize, under certain conditions, an air-contaminant source to operate without complying with applicable emission-control requirements. Ohio Adm.Code 3745-31-09(A).

**{¶ 20}** The Ohio Air Pollution Control Act prohibits certain acts. The most basic of the prohibitions is that "emissions of an air contaminant" shall not be "caused, permitted, or allowed" unless a permit or variance allowing the release of the contaminant has been issued. R.C. 3704.05(A) and (B). *See also* Ohio Adm.Code 3745-31-02(A). Additional prohibitions particularly relevant to the matter under consideration in this case are that "[n]o person who is the holder of [an air-pollution-control] permit * * * shall violate any of its terms or conditions," and that "[n]o person shall violate any order, rule, or determination of the director issued, adopted, or made under this chapter." R.C. 3704.05(C), (G), (J)(2).

**{¶ 21}** Violations of R.C. 3704.05 may result in civil and criminal liability. R.C. 3704.06(C) provides that a "person who violates section 3704.05 * * * of the Revised Code shall pay a civil penalty of not more than twenty-five thousand dollars for each day of each violation." Injunctive relief and criminal penalties are also available. R.C. 3704.06(B) and 3704.99.

### III. Analysis

**{¶ 22}** At the outset, we note that Shelly does not dispute that when a facility emits pollutants in excess of its permitted limit while operating "at or near its maximum capacity," it is out of compliance with its air-pollution-control permits and is liable for a civil penalty on the day of the failed stack test. Shelly has stipulated that its facilities emitted pollutants in excess of the respective

---

Ohio Adm.Code 3745-31-01(I).

permits' emission limits during the stack-testing process. Thus, the issue raised in this appeal is not whether any of the Shelly facilities violated their Ohio EPA-issued permits. Rather, the issue is how long the violation continued in the interim period until Shelly demonstrated compliance with the permit terms. Specifically, the issue is whether that violation may be presumed to be continuing until Shelly rebuts the presumption with competent evidence that a facility is either (1) not violating its permit or (2) not violating its permit in a continuing manner. The answer to this question will also answer whether the civil penalty for the failed stack test is to be calculated according to the rationale applied by the trial court or to that applied by the appellate court.

{¶ 23} Although it is well established that the amount of a civil penalty imposed for a violation of pollution-control policies lies within the discretion of the trial court, *e.g., State ex rel. Brown v. Dayton Malleable,* 1 Ohio St.3d 151, 157-158, 438 N.E.2d 120 (1982), Shelly and the state acknowledge that the issues involved in this case are matters of law and fact. 191 Ohio App.3d 421, 2010-Ohio-6526, 946 N.E.2d 295, ¶ 5. Consequently, our focus is whether the appellate court properly determined that the trial court's decision to limit emission violations and resulting penalties to the date of the nonconforming emission results was without some competent, credible evidence to support it. *Id.* at ¶ 55.

{¶ 24} The method prescribed by the permit for determining whether Shelly is operating within the pollution-emissions limitations of its permit is the stack test. Failing a stack test is a violation of the permit. Likewise, the stack test would normally be used also to determine when the facility has returned to compliance. When the facility passes a subsequent stack test, it has used the methodology prescribed by the permit for establishing that the facility is in compliance with the permit's pollution-emission limits. When the trial court determines, within its discretion, the amount of the penalty to be assessed for the facility's permit violation, the court must consider all of the days on which the

facility was out of compliance with its permit. Under the stack-test method that the permit specifies, this would logically include all of the days between the failed stack test and the subsequently passed stack test.

**{¶ 25}** Shelly, however, argues two points against considering all of the days between the failed stack test and the subsequently passed stack test as days that the law requires the court to include in its penalty assessment.

**{¶ 26}** First, Shelly argues that the court may not presume that the facility would exceed the permit's limit on its pollution emissions unless the state first makes a prima facie showing that the violation is likely to be ongoing or continuing. Second, Shelly argues that even if the state makes a showing that the violation is likely to be ongoing, giving rise to a presumption that the violation continued for the entire time between the failed stack test and the subsequently passed stack test, Shelly still may rebut that presumption with evidence other than the stack test to show that the facility did not exceed its emissions limits on certain days.[5]

*a. What constitutes a "showing"?*

**{¶ 27}** Shelly first asserts that the state failed to show by a preponderance of the evidence that any particular Shelly facility was likely to, or actually did, emit pollutants in excess of its allowable permit limitation for each and every day of the alleged continuing violation period, including on those days when the facility was operating under normal conditions rather than at maximum capacity.

---

5. Shelly's first proposition of law:

> In a civil enforcement action, the state has the burden of proof to demonstrate by a preponderance of the evidence each and every day of violation.

Shelly's second proposition of law:

> If a continuing violation of permit terms can be inferred, a permit holder must be given the opportunity to rebut the inference.

**{¶ 28}** The foundation for Shelly's argument is R.C. 3704.06(B), which states that the attorney general has the authority to institute proceedings for violations of R.C. 3704.05 "*upon the showing* that the person has violated this chapter or rules adopted thereunder." (Emphasis added.) Shelly contends that the phrase "upon the showing" is a standard legal term, which means the act of establishing through evidence or proof. Shelly further states that because this is civil litigation, the traditional burdens of proof apply and require the state to carry its evidentiary burden by a preponderance of evidence. Shelly also cites decisional law that it claims supports its argument. *United States v. Hoge Lumber Co.*, N.D.Ohio No. 3:95 CV 7044, 1997 U.S. Dist. LEXIS 22359 (May 7, 1997); *State ex rel. Celebrezze v. Thermal-Tron, Inc.*, 71 Ohio App.3d 11, 592 N.E.2d 912 (1992).

**{¶ 29}** R.C. 3704.06(B) is silent as to what evidentiary requirements are necessary to constitute a "showing" for purposes of the provision. However, Ohio's air-pollution-control statutes, regulations, and policies incorporate the standards contained in the federal act, which bear upon this question.

**{¶ 30}** Since 1993, Ohio law has required that all the provisions that constitute the chapter of Ohio's air-pollution-control statutes and "all the rules adopted under it, and all permits, variances, and orders issued under it shall be construed, to the extent reasonably possible, to be consistent with the federal Clean Air Act and to promote the purposes of the chapter." R.C. 3704.02(B); 1993 Am.Sub.S.B. No. 153, effective Oct. 29, 1993. Also, since 2004, 42 U.S.C. 7413(e)(2) has been incorporated by reference into Ohio's air-pollution-control regulations. Ohio Adm.Code 3745-31-01(AAAAAA)(2)(mmm).[6] Section 7413(e)(2) states:

---

6. Ohio Adm.Code 3745-31-01(AAAAAA) provides:

A penalty may be assessed for each day of violation. For purposes of determining the number of days of violation for which a penalty may be assessed * * * where * * * an air pollution control agency has notified the source of the violation, and the plaintiff makes a prima facie showing that the conduct or events giving rise to the violation are likely to have continued or recurred past the date of notice, the days of violation shall be *presumed to include the date of such notice and each and every day thereafter until the violator establishes that continuous compliance has been achieved*, except to the extent that the violator can prove by a preponderance of the evidence that there were intervening days during which no violation occurred or that the violation was not continuing in nature.

(Emphasis added.) Section 7413(e)(2).

{¶ 31} The legislative history of Section 7413(e) provides additional insight into the intent and rationale underlying the continuing-violation presumption. The Senate report accompanying the 1990 reenactment of Section

---

Incorporation by reference. This chapter includes references to certain matter or materials. The text of the incorporated materials is not included in the regulations contained in this chapter. The materials are hereby made a part of the regulations in this chapter. For materials subject to change, only the specific version specified in the regulations are incorporated. Material is incorporated as it exists on the effective date of this rule. Except for subsequent annual publication of existing (unmodified) Code of Federal Regulation compilations, any amendment or revision to a referenced document is not incorporated unless and until this rule has been amended to specify the new dates.
* * *
(2) Incorporated materials:
* * *
(mmm) Section 113 of the Clean Air Act; contained in 42 USC 7413; "Federal enforcement;" published January 19, 2004 in Supplement III of the 2000 Edition of the United States Code.

7413(e) noted that the section was rewritten to "identify explicitly a uniform set of factors that both the court and the Administrator shall consider in determining the appropriate amount of any penalty assessed under [the section]."  S.Rep. No. 101-228, at 365 (1989), reprinted in 1990 U.S.C.C.A.N. 3385, 3748 (1990).  The report continued:

> In addition, once the government * * * establishes a prima facie case showing a violation of an ongoing nature, the burden of proof would shift to the source to prove by a preponderance of the evidence that it has cured the violation or that the violation was not of a continuing nature and did not recur.  Otherwise, and until the date the source establishes that it has come into compliance, the court should presume that the violation was continuous, and should assess penalties for each day of that violation.  This shift in the burden of proof is appropriate because the source is in a better position than EPA to establish its compliance status.  In this respect, the amendment overrules *United States v. SCM Corp.*, 667 F.Supp. 1110 (D.Md.1987), in which the court refused to shift to the source the burden of proving compliance after EPA established that the source was in violation of the Act.

*Id*. at 336, reprinted in 1990 U.S.C.C.A.N. at 3749.

{¶ 32} In this case, the trial court's approach to the continuing-violation presumption and civil-penalty calculation was similar to that in the discredited *SCM Corp*. decision.  Accordingly, the appellate court properly rejected the trial court's conclusions and applied the federally established, and state-incorporated, continuing-violation presumption.  It correctly concluded that the trial court, to ensure that the state's air-pollution-control laws were construed consistently with

the federal act's provisions as required by R.C. 3704.02, should have considered the permit violations as continuing until it was proved by the violator that a particular plant was no longer in violation of its permit.

{¶ 33} Consequently, for the purposes of calculating the penalty for an air-pollution-control violation, the state must (1) establish that there was a violation of the permit requirements, (2) establish that the permit holder was notified of the violation, and (3) make a "prima facie showing that the conduct or events giving rise to the violation are likely to have continued or recurred past the date of notice." Section 7413(e)(2); *see* Ohio Adm.Code 3745-31-01(AAAAAA)(2)(mmm). Establishing the foregoing gives rise to a rebuttable presumption that the violation includes "the date of such notice and each and every day thereafter until the violator establishes that continuous compliance has been achieved" and that a penalty may be assessed for each day of violation. *Id.* The violator may rebut this presumption and avoid the imposition of a penalty by proving "by a preponderance of the evidence that there were intervening days during which no violation occurred or that the violation was not continuing in nature." *Id.*

*b. A Permit Violation and Notice of the Violation*

{¶ 34} As to establishing a violation, it is undisputed, and Shelly has so stipulated, that when the facilities failed the stack-testing requirement of the permit, a mandatory and legally enforceable term of the permit was violated and that violation is subject to the imposition of a civil penalty. R.C. 3704.05(C) and 3704.06; Section 7413(e). It is also undisputed that Shelly was given notice of the permit violation.[7] Section 7413(e).

---

7. The failure to pass a stack test is a different and independent permit violation from a permit violation in which a facility has emitted in excess of the allowable limit set forth in its permit or variance. This would be a violation of R.C. 3704.05(A) and (B). *Compare State ex rel. Brown v. Dayton Malleable, Inc.*, 1 Ohio St.3d 151, 155, 438 N.E.2d 120 (1982) (in the analogous context of water-pollution control, each term and condition of a permit is to be considered and given effect

*c. The Prima Facie Showing*

**{¶ 35}** We next consider the third element and whether the state made a prima facie showing "that the conduct or events giving rise to the violation are likely to have continued or recurred past the date of notice." Section 7413(e)(2). In light of Shelly's stipulations, a reasonable inference arises that if a Shelly facility failed the stack test on one day, and if no changes were made, it would fail the same test on a subsequent day. *Id.* Conversely, it would be illogical to conclude that without some change in the conditions or circumstances that produced the failed stack test, continuous compliance with the permit terms had been achieved.

**{¶ 36}** Therefore, when the state establishes that a permit holder failed to pass the stack test required by its permit, as is the case here, a prima facie showing is made that the violation is likely to continue. The burden of proof then shifts to the permit holder to show that either continuous compliance has been achieved or that some change in conditions has occurred to cause the violation not to be a continuing one. Section 7413(e)(2). In this regard, Shelly's reliance on the *Hoge Lumber* and *Thermal-Tron* cases is inapposite. In *Hoge Lumber,* the court determined that the prima facie presumption that the violation was of a continuing nature applied because the defendant-polluter failed to provide any contrary rebuttal evidence, and *Thermal-Tron* predates the 1993 amendments to Ohio's air-pollution-control statutes.[8]

*d. Rebuttal Evidence*

**{¶ 37}** Section 7413(e)(2) allows Shelly to rebut the presumption of a continuing violation, and the state conceded this point at oral argument.

---

in determining whether a permit has been violated; whether the pollution-discharge limit was improperly exceeded is only one part of the inquiry).

8. *Hoge Lumber* also involved permit violations that predated the 1993 amendments to Ohio's air-pollution-control statutes (of the eight violations, five were before 1993).

However, the parties disagree on what evidence may be used to properly rebut the continuing-violation presumption to mitigate the imposition of penalties. There is no apparent dispute between the parties that the penalties ceased when the Shelly facilities came back into compliance with their respective permits because they obtained modified permits or variances or conducted subsequent stack testing demonstrating that the facility was in compliance with permit requirements.

{¶ 38} The state contends, however, that Shelly could mitigate its penalties by also offering rebuttal evidence that shows that the permit violation was not of a continuing nature, with evidence such as days of nonoperation or subsequent modifications to a facility. To the extent that Ohio's air-pollution-control policies incorporate the federal enforcement and penalty-calculation provisions, we agree that the additional considerations of whether there were intervening days during which the permit violation did not occur or that the violation was not continuing in nature are "not limited to * * * evidence that is based solely on the applicable test method in the State implementation or regulation" and may include "evidence from continuous emission monitoring systems, expert testimony, and bypassing and control equipment malfunctions, even if these are not the applicable test methods." S.Rep. No. 101-228 at 366, reprinted in 1990 U.S.C.C.A.N. at 3749.

{¶ 39} Therefore, Shelly was not limited to presenting evidence that showed successful compliance with a subsequent stack test to mitigate its penalty for the permit violation. Rather, Shelly could have offered evidence that showed that the permit violation was not of a continuing nature, such as evidence that the operating conditions documented during the stack testing no longer existed, that mechanical failures were repaired, that raw materials and fuels were changed, or that Shelly scheduled retests.

{¶ 40} Shelly declined to present evidence of this character into the record.[9]   Instead, Shelly presented what it calls a "normal operations defense." According to Shelly, because the operation of the Shelly facilities at maximum-capacity for the stack test was only a snapshot of a plant's emissions over the course of a one-hour period using worst-case fuels and materials, the stack test did not reflect the normal, daily operating conditions of Shelly's facilities and, under such normal operating conditions, the normal release of emissions.  Shelly asserts that because it does not normally operate any of its facilities under the conditions required for the stack testing, the failed stack test cannot be used by the state to demonstrate that the Shelly facilities were systemically out of compliance with their respective permits—only that there was noncompliance on the day of the test.

{¶ 41} Shelly's normal-operations argument does have intuitive appeal: that the operation of a facility at less than maximum capacity will result in the emission of fewer pollutants.  Nevertheless, Shelly's normal-operations argument does not provide any actual evidence that the emissions released while operating normally are within the permit's emission limit.  The burden is on the violator to prove by a preponderance of the evidence that there were intervening days on which no violation occurred or that the violation was not continuing in nature. Consequently, Shelly's normal-operations argument, without more, does not show how the permit violation was not of a continuing nature.

{¶ 42} Based on the foregoing, we cannot conclude that Shelly presented sufficient evidence to rebut the application of a continuing-violation presumption.

---

9. Shelly implied at oral argument that it possessed this type of evidence but that it declined to submit it, relying instead on its argument that the state bore the burden of proof to show that the permit violation was of a continuing nature and on the testimonial evidence supporting its normal-operations defense.

### IV. Conclusion

**{¶ 43}** We hold that the Shelly facilities were out of compliance with their air-pollution-control permits, and thus subject to civil penalty, from the date on which stack testing showed emissions in excess of the limits specified in the permit until the permit holder demonstrated compliance with permit terms. Accordingly, we conclude that the appellate court's judgment remanding this matter to the trial court for a recalculation of the civil penalty, within the trial court's sound discretion, was appropriate.

**{¶ 44}** Nonetheless, on the state's invitation, we remand this matter to the trial court for reopening of the record to allow Shelly the opportunity to identify evidence that demonstrates that the permit violation was not a continuing violation. At that time, Shelly may identify the rebuttal evidence that addresses the actions taken by its facilities from the time when the facilities initially failed to comply with that requirement and until the facilities came back into compliance, either through a subsequent compliance-demonstrating stack test or revised permits or variances, and Shelly may demonstrate that the violation of the stack-test requirement was not of a continuing nature.

**{¶ 45}** The judgment of the court of appeals is affirmed, and the cause is remanded for proceedings consistent with this opinion.

Judgment affirmed

and cause remanded.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, and MCGEE BROWN, JJ., concur.

O'DONNELL and LANZINGER, JJ., dissent.

_____

**LANZINGER, J., dissenting.**

**{¶ 46}** I respectfully dissent. By affirming the judgment of the Tenth District Court of Appeals, holding that excessive air emissions occurring during a

stack test conducted at a facility's maximum capacity establishes a presumption that a continuing violation exists, the majority allows the state a lesser burden of proof and disregards the defendants' right to due process.

{¶ 47} After a lengthy trial and meticulous findings of fact, and as part of the total enforcement penalty of $350,123.52, the trial court assessed a civil penalty of $4,500 for Shelly's admitted violations in the seventh claim for relief. The court of appeals reversed without determining that the trial court's conclusions were against the manifest weight of the evidence. *State ex rel. Ohio Atty. Gen. v. Shelly Holding Co.,* 191 Ohio App.3d 421, 2010-Ohio-6526, 946 N.E.2d 295. Shelly does not dispute that in 2002 and 2006, five of its facilities violated the air-emissions levels set forth in their permits to install ("PTIs") during the time that stack tests measured them at maximum capacity. What Shelly does contest is its ongoing liability for a "continuing violation" based on the record of this case.

{¶ 48} I would accept Shelly's argument that no continuing civil penalty may be assessed because notwithstanding the excess pollutants that were emitted on the day of testing, the state has not met its burden of proving that excess pollutants were emitted every day for which a penalty is sought.

I. Legal Argument

*A. The State Must Prove a Continuing Violation to Collect Ongoing Civil Penalties*

{¶ 49} As the majority explains it, the issue here is "how long the violation continued in the interim period until Shelly demonstrated compliance with the permit terms. Specifically, the issue is whether that violation may be presumed to be continuing until Shelly rebuts the presumption with competent evidence that a facility is either (1) not violating its permit or (2) not violating its permit in a continuing manner." Majority opinion at ¶ 22. In other words, is the defendant liable for a civil penalty for a continuing violation?

{¶ 50} This is a civil enforcement action. Ohio law requires the state to show by a preponderance of the evidence that a violation of law actually occurred for each day the state seeks a penalty or that an ongoing violation occurred before the state can collect penalties for a continuing violation. *Cincinnati, Hamilton & Dayton Ry. v. Frye,* 80 Ohio St. 289, 88 N.E. 642 (1909), paragraph two of the syllabus ("In civil cases the jury deals only with probabilities, and the burden of proof is ordinarily carried by a preponderance of the evidence"); *Ohio Valley Radiology Assocs. v. Ohio Valley Hosp. Assn.,* 28 Ohio St.3d 118, 122, 502 N.E.2d 599 (1986) ("the sole responsibility of a defendant who has effectively contested the claimant's allegations by pleading is to refute the claimant's case *after* the latter has established a prima facie case by proper evidence" [emphasis sic]).

{¶ 51} Even under 42 U.S.C. 7413(e)(2), the section of the Clean Air Act that sets forth the standard for federal enforcement actions, the plaintiff must make a prima facie showing that the conduct or events giving rise to the violation are likely to have continued or recurred after the defendant has been notified of the violation:

> [W]here the Administrator or an air pollution control agency has notified the source of the violation, and the plaintiff makes *a prima facie showing that the conduct or events giving rise to the violation are likely to have continued or recurred past the date of notice*, the days of violation shall be presumed to include the date of such notice and each and every day thereafter until the violator establishes that continuous compliance has been achieved, except to the extent that the violator can prove by a preponderance of the evidence that there

were intervening days during which no violation occurred or
that the violation was not continuing in nature.

(Emphasis added.)  42 U.S.C. 7413(e)(2).

**{¶ 52}** In other words, in a federal enforcement action, there is no presumption of a continuing permit violation unless a prima facie showing has been made. The government carries the burden of making a prima facie showing that the conduct or events giving rise to the violation are likely to have continued each day.  It is only after this prima facie showing is made that the defendant must offer rebuttal evidence that a continuing violation has not occurred.

**{¶ 53}** A federal enforcement action brought under the Clean Air Act offers guidance as to what a state could do to fulfill its own burden to prove a violation under its own environmental laws.  *United States v. Hoge Lumber Co.*, N.D.Ohio No. 3:95 CV 7044, 1997 U.S. Dist. LEXIS 22359 (May 7, 1997).  In *Hoge,* the court found that a continuing violation had occurred based on unrebutted evidence offered by the Department of Justice showing actual stack-test exceedances (eight in all) plus (1) an affidavit from an expert engineer who testified that the permit holder performed eight stack tests on its boiler under various operational conditions, including operating conditions as low as 22 percent of capacity (i.e., not maximum operating capacity) and that all eight stack tests showed emissions violations, (2) testimony by a company witness who testified that the boiler was not operating in compliance with its air permit limits and expressed doubt that the boiler could ever meet the emission limit required by the air permit, and (3) evidence of actual days on which the defendant operated its boiler in a manner exceeding emissions—700 days over a 12-year period.

**{¶ 54}** But here, in contrast, the state did not offer any evidence that "the conduct or events giving rise to the violation are likely to have continued or

recurred past the date of notice." 42 U.S.C. 7413(e)(2). And the majority holds that the state establishes a prima facie case with a single failed stack test.

{¶ 55} In another case dealing with the need for a PTI to control air emissions, we stated:

> Keeping in mind the purposes of R.C. Chapter 3704, we must strive to reach a balance between promoting and enhancing clean air and protecting and encouraging economic growth and opportunities for the people of this state. This requires that business entities not be subjected to an interminable task of dealing with excessive regulation or requirements not explicitly covered by statute or rule. Therefore, any uncertainty with regard to the interpretation of R.C. Chapter 3704 and rules promulgated thereunder should be construed in favor of the person or entity (manufacturer or otherwise) affected by the law.

*State ex rel. Celebrezze v. Natl. Lime & Stone Co.*, 68 Ohio St.3d 377, 385, 627 N.E.2d 538 (1994). At the very least, the state must be held to its burden of proof.

*B. One Failed Stack Test Does Not Prove a Continuing Violation*

{¶ 56} Each of Shelly's PTIs requires the facility to be operating within the allowable levels of various pollutants as established for each facility. Part II, Section A.1 of the individual permits sets forth both emissions limits per hour and emissions limits per year. Each permit sets allowable levels of emissions for certain classes of air pollutants. Part II, Section E.1 of the permits specifies the testing methods that the plant must use to establish compliance. In Shelly's case, the use of a plant's maximum operating capacity is a stated part of the testing protocol. On testing day, facility emissions are tested when a plant is operating its air-pollution sources at the maximum capacity possible. ("The test shall be

conducted while the emissions unit is operating at or near its maximum capacity * * *.") While the permit limits emissions both by hour and by year, the stack test requires measurement of emissions only on a particular day.

{¶ 57} The majority treats this testing requirement as a separate permit term. But the seventh claim for relief in the complaint against Shelly alleges air-emission violations, not testing violations. There is no allegation that Shelly violated the testing requirements themselves—the tests were done in accordance with the maximum-capacity protocol set forth in the permit. Stated another way, the permit does not mandate that Shelly's plants operate at a constant maximum capacity so as to support a presumption that emissions levels are continuously being exceeded once an initial stack test has been failed.

{¶ 58} Shelly's argument that a stack test does not represent normal operating conditions at its facilities is compelling. Thus, on days when a facility is not running at maximum capacity, it is possible that air emissions are within the limit established in that facility's PTI. In failing to show that the emissions violations (appearing when the facility was running at maximum capacity) were likely to continue, the state failed to present evidence to support the presumption of a continuing air-emission violation that justified daily penalties.

{¶ 59} A civil penalty pursuant to R.C. 3704.06(C) was in order based upon Shelly's admitted violations of facilities named in the seventh claim for relief. Nevertheless, the state offered no evidence beyond the single failed test to show that a continuing violation existed beyond the dates of each failed stack test.

{¶ 60} The court of appeals' opinion looked at a snapshot in time—stack testing at maximum capacity—and created an irrebuttable presumption that the company is continuously violating its permit until it shows that it can pass another stack test, which realistically will not occur before at least 30 days after Shelly gives the requisite notice to the Ohio Environmental Protection Agency, according to Part II, Section E.1 of the permits. Even if this court applies the

federal Clean Air Act's prima facie burden-of-proof standard, as the state now urges, the state still has the burden to show that the conduct or events giving rise to the violation are likely to have continued or recurred. 42 U.S.C. 7413(e)(2).

## II. Conclusion

{¶ 61} Civil penalties of up to $25,000 a day are significant deterrents to environmental violations, and potential penalties should be imposed only for each day that the state has proven a violation by a preponderance of the evidence.

{¶ 62} Because a continuing violation has not been proven in this case, I would reverse the judgment of the court of appeals. I would hold that in a civil action pursuant to R.C. 3704.06, the state must prove each day of violation for which it seeks a civil penalty.

O'DONNELL, J., concurs in the foregoing opinion.

_____

Michael DeWine, Attorney General, Alexandra T. Schimmer, Solicitor General, and Gregg H. Bachmann and Gary L. Pasheilich, Assistant Attorneys General, for appellee.

Bott Law Group, L.L.C., and April R. Bott; Chester, Wilcox & Saxbe, L.L.P., and Sarah Morrison, for appellants Shelly Materials, Inc. and Allied Corporation.

Brady, Coyle & Schmidt, Ltd., and Brian P. Barger, urging reversal for amici curiae Ohio Chamber of Commerce, Ohio Aggregates and Industrial Minerals Association, Flexible Pavements, Inc., Ohio Coal Association, Ohio Contractors Association, and Associated General Contractors of Ohio.

_____